JOHN A. O'MALLEY (BAR NO. 101181)
john.omalley@nortonrosefulbright.com
CRISTINA C. LONGORIA (BAR NO. 295612)
cristina.longoria@nortonrosefulbright.com
**FULBRIGHT & JAWORSKI LLP**
555 South Flower Street
Forty-First Floor
Los Angeles, California  90071
Telephone:   (213) 892-9200
Facsimile:   (213) 892-9494

Attorneys for Defendant
DUKE UNIVERSITY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| JOHN WAYNE ENTERPRISES, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>DUKE UNIVERSITY, a North Carolina corporation; and DOES 1 through 10,<br><br>Defendants. | Case No.: SACV14-01020 DOC (ANx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT DUKE UNIVERSITY'S MOTION TO DISMISS**<br><br>Hearing Date: September 8, 2014<br>Hearing Time: 8:30 a.m.<br><br>(Hon. David O. Carter) |

40845978.10

DOCUMENT PREPARED
ON RECYCLED PAPER

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................... 1

II. STATEMENT OF FACTS ........................................................................ 1

    A.    Duke and Its Mark are Famous .................................................. 1

    B.    Duke's Home Is North Carolina ................................................ 2

    C.    California Is Not Home ................................................................ 4

    D.    Plaintiff and the TTAB Proceedings ........................................ 5

    E.    Plaintiff's Preemptive Lawsuit ................................................. 6

III. ARGUMENT AND AUTHORITIES ....................................................... 7

    A.    This Suit Should Be Dismissed for Lack of Personal Jurisdiction ....... 7

        1.    Duke Is Not Subject to General Jurisdiction in California ......... 7

            a.    Duke is not "at home" in California ............................... 7

            b.    Duke's contacts with California are consistent with those of any nationally prominent out-of-state university and are insufficient for general jurisdiction ................................................................. 10

        2.    Duke Is Not Subject to Specific Jurisdiction in California ...... 14

            a.    Plaintiff's claims do not arise out of Duke's forum-related activities ................................................ 15

            b.    The exercise of jurisdiction would be unreasonable and unjust ........................................................................ 16

    B.    This Suit Should Be Dismissed for Improper Venue ......... 18

IV. CONCLUSION .......................................................................................... 20

DOCUMENT PREPARED
ON RECYCLED PAPER

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Univ. Sys., Inc. v. Am. Univ.*,
  858 F. Supp. 2d 705 (N.D. Tex. 2012) .......................................................... 11, 13

*Amoco Egypt Oil Co. v. Leonis Navigation Co., Inc.*,
  1 F.3d 848 (9th Cir. 1993) ................................................................................ 16

*Atl. Marine Constr. Co., Inc. v. United States Dist. Court*,
  134 S. Ct. 568 (2013) ................................................................................... 18, 19

*Bandai Am., Inc. v. Brown*,
  No. CV 00-13364 WMB, 2001 U.S. Dist. LEXIS 24280
  (C.D. Cal. June 1, 2001) .................................................................................... 17

*Daimler AG v. Bauman*,
  134 S. Ct. 746 (2014) .................................................................... 1, 7, 8, 10, 12

*Douglas Furniture Co. of Cal., Inc. v. Wood Dimensions, Inc.*,
  963 F. Supp. 899 (C.D. Cal. 1997) .............................................................. 16, 17

*Duchesneau v. Cornell Univ.*,
  No. 08-4856, 2009 U.S. Dist. LEXIS 19125
  (E.D. Pa. Feb. 26, 2009) .............................................................................. 12, 14

*Duke University v. Haggar Clothing Co.*,
  Opposition No. 108,304, (Trademark Trial and Appeal Board
  April 21, 2003) ................................................................................................... 2

*Ferris v. Rollins College Inc.*,
  No. 1:08-cv-00039-SPM-AK, 2008 U.S. Dist. LEXIS 109791
  (N.D. Fla. Oct. 9, 2008) .................................................................................... 14

*Gehling v. St. George's Sch. of Med., Ltd.*,
  773 F.2d 539 (3d Cir. 1985) ......................................................................... 10, 13

*Golden Scorpio Corp. v. Steel Horse Bar & Grill*,
  596 F. Supp. 2d 1282 (D. Ariz. 2009) .............................................................. 18

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  131 S. Ct. 2846 (2011) ............................................................. 7, 8, 13

*Hershman v. Muhlenberg College*,
  No. 3:13CV00594(RNC) OP, 2013 U.S. Dist. LEXIS 157343
  (D. Conn. Nov. 4, 2013) .................................................................. 14

*Hid Global Corp. v. Isonas, Inc.*,
  No. SA CV 14-0052-DOC(ANx), 2014 U.S. Dist. LEXIS 56024
  (C.D. Cal. Apr. 21, 2014) ............................................... 1, 8, 13, 16

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945) ......................................................................... 7

*Jenkins v. Miller*,
  983 F. Supp. 2d 423 (D. Vt. 2013) .................................................. 12

*Kober v. Am. Univ. of Carribean NV, Inc.*,
  No. 11-cv-0623, 2012 U.S. Dist. LEXIS 84207
  (W.D. La. May 25, 2012) ................................................................. 11

*Kurzon LLP v. Thomas M. Cooley Law Sch.*,
  No. 12CV8352-LTS-RLE, 2014 U.S. Dist. LEXIS 85776
  (S.D.N.Y. June 24, 2014) ................................................................ 12

*Mattel, Inc. v. Greiner & Hausser GmbH*,
  354 F.3d 857 (9th Cir. 2003) ...................................................... 14, 15

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
  647 F.3d 1218 (9th Cir. 2011) ................................................. 7, 13, 16

*Meyer v. Bd. of Regents*,
  No. 13 Civ. 3128 (CM), 2014 U.S. Dist. LEXIS 68510
  (S.D.N.Y. May 14, 2014) .............................................................. 9, 12

*Murphy v. Schneider Nat'l, Inc.*,
  349 F.3d 1224 (9th Cir. 2003) ......................................................... 18

*Park v. Oxford Univ.*,
  35 F. Supp. 2d 1165 (N.D. Cal. 1997) ............................................. 11

DOCUMENT PREPARED
ON RECYCLED PAPER

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Piedmont Label Co. v. Sun Garden Packing Co.*,
    598 F.2d 491 (9th Cir. 1979) ............................................................. 18

*Prawoto v. Primelending*,
    720 F. Supp. 2d 1149 (C.D. Cal. 2010) ............................................. 18

*Scherer v. Curators of the Univ. of Missouri*,
    152 F. Supp. 2d 1278 (D. Kan. 2001) ............................................... 11

*Schwarzenegger v. Fred Martin Motor Co.*,
    374 F.3d 797 (9th Cir. 2004) ............................................................. 16

*Shute v. Carnival Cruise Lines*,
    897 F.2d 377 (9th Cir. 1990) ............................................................. 16

*Snodgrass v. Berklee College of Music*,
    No. 12-cv-10255, 2013 U.S. Dist. LEXIS 92618
    (N.D. Ill. July 2, 2013) ............................................................... 11, 12

*Watiti v. Walden Univ.*,
    No. 07-4782 (JAP), 2008 U.S. Dist. LEXIS 43217
    (D.N.J. May 30, 2008) ...................................................................... 10

*Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*,
    433 F.3d 1199 (9th Cir. 2006) ..................................................... 15, 17

*Ziegler v. Indian River County*,
    64 F.3d 470 (9th Cir. 1995) ................................................................. 7

**Rules and Statutes**

28 U.S.C. § 1391(b) ................................................................................ 18, 19

28 U.S.C. § 1391(c)(2) .................................................................................. 19

CAL. CIV. PROC. CODE ANN. § 410.10 ............................................................ 7

FED. R. CIV. P. 12(b)(2) ................................................................................ 20

FED. R. CIV. P. 12(b)(3) ................................................................................ 20

DOCUMENT PREPARED
ON RECYCLED PAPER

I. **INTRODUCTION**

This action should never have been filed. There are ongoing proceedings before the Trademark Trial and Appeal Board ("TTAB") where trademark rights will be resolved. There is no legitimate claim of personal jurisdiction over Duke University ("Duke" or the "University") in California, as Duke's home is Durham, North Carolina. Even before the Supreme Court's *Daimler* decision, Duke has never had the degree of contacts that would make it generally amenable to jurisdiction in California. Nor does this declaratory judgment action supply the necessary contacts to establish specific jurisdiction. Venue is similarly improper. As this Court recently recognized in a similar intellectual property context, *Hid Global Corp. v. Isonas, Inc.*, dismissal is appropriate and required.

II. **STATEMENT OF FACTS**

A. **Duke and Its Mark are Famous**

Duke is a non-profit research and educational institution located in Durham, North Carolina. (Declaration of Kate S. Hendricks ("Hendricks Decl.") ¶ 2.) The University assumed the DUKE name in 1924 in part to honor the Duke family's substantial support of the school. Since then, Duke has become one of the finest research universities in the United States. Duke's graduate and professional schools—which offer programs in virtually every field, including business, divinity, engineering, the environment, law, medicine, nursing, and public policy—are among the leaders in their fields. Duke's athletic program is also very well-known, and Duke teams have competed in the NCAA Division I, primarily in the Atlantic Coast Conference (ACC), since 1953. Duke's varsity teams have collectively won 15 NCAA National Championships and 126 ACC Championships, in sports ranging from basketball, football, and soccer to golf and tennis.[1]

---

[1] Duke University, Office of News & Communications, Quick Facts About Duke, http://newsoffice.duke.edu/all-about-duke/quick-facts-about-duke (last visited Aug. 5, 2014); DUKE UNIVERSITY AT A GLANCE 1 (Fall 2013),

DOCUMENT PREPARED
ON RECYCLED PAPER

1    Duke's first use of its now-famous mark DUKE was in 1924 in connection
2  with academic services, and by approximately 1925 it had begun offering a variety
3  of different goods and services in connection with the mark, including clothing.
4  Use of the mark DUKE has never ceased since that time, and in fact has increased
5  substantially over the last 90 years, over which time the fame and strength of
6  Duke's registered (and incontestable) DUKE mark has increased as well.  For many
7  decades, Duke has operated a licensing program, pursuant to which it permits its
8  licensees to use the DUKE mark on and in connection with approved products and
9  services.[2]

10    The fame of the University, its athletic program, and its DUKE mark, all are
11  matters of public record.  In early 2000, Duke commissioned a survey to test the
12  fame of its mark, and the results were unequivocal:  Duke was a famous mark with
13  no other institution or individual (including John Wayne) achieving statistically
14  significant levels of recognition.  The TTAB confirmed that finding and said:

15    The record shows that [Duke] is a famous private university . . .
16    Duke's intercollegiate basketball program is at least as well known as
17    the university's academic prowess. . . .

18    …

19    The fame of [Duke's] mark has been clearly established[.]

20  Exhibit A (Haggar Decision) at 6, 10, 13.  That connection and fame continues to
21  be borne out today.

22    **B.    Duke's Home Is North Carolina**

23    Duke is organized under the non-profit corporation law of North Carolina

24  http://today.duke.edu/showcase/mmedia/pdf/duke_at_glance.pdf; Wikipedia, Duke
25  University, http://en.wikipedia.org/wiki/Duke_University (last visited Aug. 5,
26  2014).

27  [2] *See generally supra* n. 1; *Duke University v. Haggar Clothing Co.*, Opposition
    No. 108,304, at 10 (Trademark Trial and Appeal Board April 21, 2003) ("Haggar
28  Decision").  The Haggar Decision is attached as Exhibit A.

and has its offices and principal place of business in Durham, North Carolina. (Hendricks Decl. ¶ 2.)  Specifically, Duke's home campus and the offices of all of its corporate officers are situated in Durham County, North Carolina. (*Id.* ¶ 3.)  The campus houses both undergraduate and graduate schools and the University's residence halls. (*Id.*)  Duke owns or controls approximately 8,500 acres in North Carolina in the vicinity of its campus.     (*Id.* ¶ 4.)  The Duke Marine Lab (including three research water vessels) is located on the coast of North Carolina. (*Id.* ¶ 5.)

Duke serves approximately 6,500 undergraduate students and 8,100 graduate and professional students at its campus in Durham and its environs. (*Id.* ¶ 6.)  In addition, Duke has nearly 26,000 employees, including roughly 3,300 faculty, the vast majority of whom are located in or near Durham. (*Id.* ¶ 7.)  Duke also has numerous different computer, retail, book, and office service operations on its home campus. (*Id.* ¶ 8.)  The Office of Duke University Stores, which supervises these operations, is located on Duke's campus in Durham, as are Duke's Office and Director of Trademark Licensing. (*Id.*)  Duke's motor vehicle fleet of hundreds of vehicles is licensed in North Carolina and based in Durham. (*Id.* ¶ 10.)  Duke has an extensive network of facilities that it owns, and others with which it contracts, for the provision of food and beverages to students, employees, visitors and others at its North Carolina premises.   These include restaurants, cafés, food trucks, catering companies, and fast food services, which collectively serve hundreds of thousands of meals to students, employees, fans and others every year. (*Id.* ¶ 9.)

As might be expected, Duke's economic impact on Durham and North Carolina is substantial.  Duke is among the largest employers in the State of North Carolina.  (*Id.* ¶ 7.)  Duke's Office of Durham and Regional Affairs works to improve the quality of life and public education in Durham and build strong Duke-Durham relations.  In 2008, Duke created the position of Vice President for Durham and Regional Affairs to strengthen and highlight Duke's role as a partner and

DOCUMENT PREPARED
ON RECYCLED PAPER

1   advocate in Durham and the surrounding North Carolina region.[3]

2   ## C.   California Is Not Home

3   Duke's contacts with California are quite limited and are very different than

4   its contacts with North Carolina.  Duke (1) is not incorporated in California; (2) is

5   not registered to do business in California; (3) has no agent for service of process in

6   California; (4) pays no California payroll or property taxes; (5) has no campus,

7   office, or store in California; (6) owns no real property in California; and (7) has no

8   corporate bank accounts in California.  (Hendricks Decl. ¶¶ 11-17.)

9   Duke's most significant contacts with California are minimal and are

10  consistent with those of any non-California nationally prominent university.  For

11  example, Duke:  (1) recruits and admits students from California and nationwide,

12  who may apply through Duke's website; (2) has sent various athletic teams to

13  California and elsewhere to play sports; (3) is registered to raise money in

14  California (and 23 other states that require such registration)[4]; (4) has two global

15  education programs in California involving about 30 students per year; (5)

16  maintains contact with alumni, some of whom are located in California and

17  organize alumni functions there; and (6) advertises and sells University

18  paraphernalia through its catalogs and online store, meaning products may be

19  purchased by California residents and non-California residents alike.  (Id. ¶¶ 18-

20
21  [3] DUKE UNIVERSITY'S OFFICE OF DURHAM AND REGIONAL AFFAIRS, OUR FIVE-YEAR REPORT TO THE COMMUNITY 2-5 (2013), http://testing.komplekscreative.com/duke-dara/wordpress/wp-content/uploads/2014/03/DARA-5-Year-Report.pdf.

22
23  [4] As the Attorney General's website indicates, this basic registration is not tantamount to a registration to do business in California.  In fact, Duke is statutorily

24  exempt from additional registration requirements.  See CALIFORNIA ATTORNEY

25  GENERAL'S        GUIDE        for        CHARITIES        34-35        (2005), http://oag.ca.gov/sites/all/files/agweb/pdfs/charities/publications/guide_for_charities.pdf ("Most charities must file annual financial reports with the Attorney General's

26  Registry of Charitable Trusts. These reports must be filed by all public benefit

27  corporations and charitable trusts, unless they are exempted by statute. Currently,

28  hospitals, schools, and churches are exempt from the annual filing requirements.").

1  23.)

2          **D.      Plaintiff and the TTAB Proceedings**

3          Since at least 2005, Plaintiff John Wayne Enterprises, LLC and its

4  predecessor ("Plaintiff") and Duke have been involved in numerous proceedings

5  before the TTAB in connection with marks each of the parties has sought to

6  register.  (Declaration of Susan Freya Olive ("Olive Decl.") ¶ 2.)  Over the years—

7  although Plaintiff failed to mention it in the complaint—the TTAB has sustained

8  opposition and cancellation proceedings brought by Duke, resulting in denial of two

9  applications and cancellation of one registration of Plaintiff for marks that involve

10  "DUKE."  (*Id.* ¶ 3.)  In addition—although again omitted from the complaint—

11  Plaintiff has filed requests for extensions of time to oppose Duke applications for

12  registration and has unsuccessfully attempted to prevent and delay Duke from

13  registering Duke's own marks.  For example, Plaintiff filed oppositions attempting

14  to prevent Duke from registering DUKE for clothing and DUKE MEDICINE for

15  medical and other services.  In each case, judgment was entered in favor of Duke.

16  (*Id.* ¶ 4.)

17          Currently, the parties are involved in opposition proceedings before the

18  TTAB (which is located in Alexandria, Virginia), and Duke has requested an

19  extension of time to oppose one more pending application filed by Plaintiff.  All

20  three cases were instigated by Plaintiff's attempt to register, on an intent-to-use

21  basis, several marks that involve "DUKE" in connection with alcoholic beverages.

22  (*Id.* ¶ 5.)

23          To protect its preexisting trademark rights, and in accordance with standard

24  Trademark Office procedures, Duke filed with the TTAB Notices of Opposition to

25  Plaintiff's applications in November and December 2013.  (*Id.* ¶ 6.)  An institution

26  order, requiring Plaintiff to answer, did not issue in the first-filed proceeding until

27  May 2014.  Nonetheless, the proceeding has moved expeditiously since that time:

28  an answer has been filed, the pretrial conference has occurred, and the discovery

period has opened.   (*Id.*)   The second-filed proceeding was more promptly instituted and is nearing the close of discovery.  Each side has served and objected or otherwise responded to interrogatories and requests for production of documents, and Plaintiff also has objected and/or responded to requests for admission.  Expert reports are due in that proceeding on August 22, 2014—approximately two weeks from now.  (*Id.* ¶ 7.)

Plaintiff very recently (on July 24) filed a motion to suspend proceedings before the TTAB pending the conclusion of the California proceedings.  Duke's brief in opposition to that motion is not yet due, and no action has been taken on the motion.  (*Id.* ¶ 9.)

### E.   Plaintiff's Preemptive Lawsuit

Though the parties were in the midst of TTAB proceedings and were corresponding concerning them, Plaintiff filed this suit without providing any advance notice to Duke.  (Olive Decl. ¶ 8.)  Plaintiff's lawsuit assumes an actual controversy exists,[5] and seeks a declaration of rights as to issues related to those now being addressed in the TTAB.  The complaint offers conclusory statements regarding personal jurisdiction and identifies contacts with California that are typical of any nationally prominent out-of-state university. (Dkt. 1 ¶¶ 28-34.)

Plaintiff has brought this action in a forum thousands of miles from Duke's home, in an improper venue and in a state where Duke plainly lacks sufficient jurisdictional contacts.  Accordingly, Duke respectfully requests that the Court dismiss the action.

---

[5] Duke does not concede that this case involves an "actual controversy" and expressly reserves the right to challenge subject matter jurisdiction.  Duke points out that the two applications it currently is opposing, as well as the third application that it is reviewing, all were filed by Plaintiff on an "intent to use" basis.  Such applications in essence propose a theoretical future use; they offer no evidence as to how a mark actually is used and cannot under any circumstances serve as a basis of any claim for infringement because there is no claim to actual use of the mark.

DOCUMENT PREPARED
ON RECYCLED PAPER

## III.   ARGUMENT AND AUTHORITIES

### A.   This Suit Should Be Dismissed for Lack of Personal Jurisdiction

"For a court to exercise personal jurisdiction over a nonresident defendant consistent with due process, that defendant must have 'certain minimum contacts' with the relevant forum 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 1101 (2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (additional quotation marks and citation omitted).  A federal district court may exercise either general or specific personal jurisdiction.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011); *Ziegler v. Indian River County*, 64 F.3d 470, 473 (9th Cir. 1995).   Personal jurisdiction over a nonresident defendant must not only satisfy federal due process, it must be permitted by a state's long-arm statute.  *Ziegler*, 64 F.3d at 473.  Because California's long-arm statute is coextensive with federal due process requirements, the analysis here is whether exercising personal jurisdiction over Duke comports with federal due process.  *See Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014) (citing CAL. CIV. PROC. CODE ANN. § 410.10 (West 2004)); *Mavrix Photo*, 647 F.3d at 1223 (same); *Ziegler*, 64 F.3d at 473.

When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction.  *Mavrix Photo*, 647 F.3d at 1223.  Here, Plaintiff cannot meet its burden, and there is no basis for the Court to exercise either general or specific personal jurisdiction over Duke.

### 1.   Duke Is Not Subject to General Jurisdiction in California

#### a.   Duke is not "at home" in California

There is no general jurisdiction because Duke is not "essentially at home" in California.  "'[A] court may assert general jurisdiction over foreign (sister-state or

DOCUMENT PREPARED
ON RECYCLED PAPER

foreign-country) corporations to hear any and all claims against them when their affiliations with the State are **so "continuous and systematic" as to render them essentially at home in the forum State**.'" *Daimler*, 134 S. Ct. at 754 (quoting *Goodyear*, 131 S. Ct. at 2851) (emphasis added).[6]  In *Daimler*, the Supreme Court made clear that the bar for general jurisdiction is extremely high,[7] that a nonresident corporation is subject to general jurisdiction in a state when it is "comparable to a domestic enterprise in that State" (*id.* at 758 n. 11), and that it is "unacceptably grasping" to find general jurisdiction in every state in which a corporation "engages in a substantial, continuous, and systematic course of business." *Id.* at 760-61.  The Court identified a corporation's place of incorporation and principal place of business as the paradigm bases for general jurisdiction, which afford plaintiffs "at least one clear and certain forum in which a corporate defendant may be sued on any and all claims." *Id.* at 760.  And it explained that general jurisdiction will exist outside of the paradigm bases only in the "exceptional case" and where the company is "at home." *Id.* at 761 n. 19.  As one court summarized:

> *Daimler* made it clear that, as a rule, it is not constitutionally permissible to sue an individual or corporation in a state where that individual is not "at home" unless the defendant's activities in the

---

[6] As this Court recently recognized, *Daimler* addressed "foreign" corporations based either outside the United States or in a sister state.  *Hid Global Corp. v. Isonas, Inc.*, No. SA CV 14-0052-DOC(ANx), 2014 U.S. Dist. LEXIS 56024, at *9-10 (C.D. Cal. Apr. 21, 2014).

[7] *See id.* at 757 (that a company is engaged in "continuous activity of some sorts within a state" is not enough); *id.* at 760 ("only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there"); *id.* at 761 ("the inquiry under *Goodyear* is not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's 'affiliations with the State are so "continuous and systematic" as to render [it] essentially at home in the forum State'") (citation omitted); *id.* at 762 n. 20 ("A corporation that operates in many places can scarcely be deemed at home in all of them.").

DOCUMENT PREPARED
ON RECYCLED PAPER

forum state are the basis for the lawsuit . . . [A] corporation is "at home" where it is incorporated and where it has its principal place of business.

*Meyer v. Bd. of Regents*, No. 13 Civ. 3128 (CM), 2014 U.S. Dist. LEXIS 68510, at *6 (S.D.N.Y. May 14, 2014).

This is not an exceptional case where the exercise of general jurisdiction is proper, as Duke is "at home" in North Carolina and not California. *See supra* pp. 3-5. Duke is organized under the laws of North Carolina, with its principal place of business, its offices, and all of its officers in Durham County, North Carolina. (Hendricks Decl. ¶¶ 2-3.) Duke's home campus is located in North Carolina, as are its residence halls, its marine lab, its motor vehicle fleet, and its computer, retail, book, food, vending, and office service operations. (*Id.* ¶¶ 3-5, 8-10.)

Duke's limited contacts with California demonstrate that it is not "at home" there. Duke (1) is not incorporated in California; (2) is not registered to do business in California; (3) has no agent for service of process in California; (4) pays no California payroll or property taxes; (5) has no campus, office, or store in California; (6) owns no real property in California; and (7) has no corporate bank accounts in California. (Hendricks Decl. ¶¶ 11-17.) Duke's contacts with California are typical of any nationally prominent university outside of California. For example, it: (1) recruits and admits students from California and nationwide, who may apply through Duke's website; (2) has sent various athletic teams to California and elsewhere to play sports; (3) is registered to raise money in California and many other states; (4) has two global education programs in California involving about 30 students per year; (5) maintains contact with alumni, some of whom are located in California and organize alumni functions there; and (6) advertises and sells University paraphernalia through its catalogs and online store, meaning products may be purchased by California residents and non-California residents alike. (*Id.* ¶¶ 18-23.)

1    In short, Duke's contacts with California do not come close to approximating

2    its contacts with North Carolina, and they do not otherwise indicate that Duke is

3    subject to general jurisdiction in California.

4         **b.    Duke's contacts with California are consistent with**

5               **those of any nationally prominent out-of-state**

6               **university and are insufficient for general jurisdiction**

7    Even before *Daimler*, federal courts throughout the country recognized a

8    higher bar for exercising general jurisdiction over out-of-state educational

9    institutions, a bar that this case does not surpass. *See, e.g.*, *Watiti v. Walden Univ.*,

10   No. 07-4782 (JAP), 2008 U.S. Dist. LEXIS 43217, at *15 (D.N.J. May 30, 2008)

11   ("[C]ourts apply a fairly stringent jurisdictional test to colleges and universities

12   apparently in deference to the 'non-profit educational mission' of these

13   organizations.") (footnote omitted). The Third Circuit set the standard for

14   jurisdictional analyses of university contacts, recognizing in *Gehling v. St.*

15   *George's Sch. of Med., Ltd.*, 773 F.2d 539 (3d Cir. 1985), that a West Indies

16   Medical School was not subject to general jurisdiction in Pennsylvania despite the

17   fact that the school advertised in national newspapers that circulated in

18   Pennsylvania; admitted students who were Pennsylvania residents and who paid the

19   school several hundred thousand dollars annually in tuition; sent school

20   representatives to Pennsylvania as part of a media tour in which they appeared on

21   radio and television programs that reached hundreds of thousands of

22   Pennsylvanians; and entered into an agreement with a Pennsylvania college to

23   establish a joint international program combining pre-medical studies in

24   Pennsylvania with medical training in Grenada. *Id.* at 541-43.

25   Following the Third Circuit in *Gehling*, "other courts analyzing analogous

26   cases have held that an out-of-state school is not subject to general jurisdiction

27   simply because it may draw students from the forum state, receive revenue from the

28   forum state through tuition or fundraising activities, or have contacts with alumnae

DOCUMENT PREPARED
ON RECYCLED PAPER

in the forum state." *Scherer v. Curators of the Univ. of Missouri*, 152 F. Supp. 2d 1278, 1283 (D. Kan. 2001) (collecting cases); *see also Kober v. Am. Univ. of Carribean NV, Inc.*, No. 11-cv-0623, 2012 U.S. Dist. LEXIS 84207, at *7-8 (W.D. La. May 25, 2012) (collecting cases); *Park v. Oxford Univ.*, 35 F. Supp. 2d 1165, 1167 (N.D. Cal. 1997) ("long standing academic interaction between Oxford and California," Oxford's purchase of academic materials from California companies, and Oxford's solicitation of money from California residents "fall far short of establishing general jurisdiction"), *aff'd*, 165 F.3d 917 (9th Cir. 1998).

Similarly, general recruiting or solicitation in the forum state and having employees who are residents of the forum will not give rise to general jurisdiction. *See Scherer* 152 F. Supp. 2d at 1283-84; *Snodgrass v. Berklee College of Music*, No. 12-cv-10255, 2013 U.S. Dist. LEXIS 92618, at *8-12 (N.D. Ill. July 2, 2013) (no general jurisdiction in Illinois even though schools had public websites, admitted students from Illinois, maintained active Chicago alumni groups, and one of the defendant universities had "a handful of part-time employees" working in Illinois and an admissions representative in Illinois for 30 days each year), *aff'd*, 2014 U.S. App. LEXIS 4678 (7th Cir. Mar. 13, 2014); *Am. Univ. Sys., Inc. v. Am. Univ.*, 858 F. Supp. 2d 705, 713-15 (N.D. Tex. 2012) (no general jurisdiction in Texas where defendant university attended about 200 events in Texas, employed scores of people with Texas addresses, entered into several contracts with Texas forum selection clauses, and paid more than $45 million to over 800 Texas businesses, among other contacts).   As one court explained:   "Evidence that a university recruits or admits students from the forum state, employs forum residents, receives revenue from the state in the form of tuition or fundraising, or has contacts with prospective students and alumni in the state is simply insufficient to support the exercise of general jurisdiction." *Am. Univ.*, 858 F. Supp. 2d at 714 (citations omitted).

Nor do the following activities confer general jurisdiction:

DOCUMENT PREPARED
ON RECYCLED PAPER

- Participating in athletic activities in the forum state. *Jenkins v. Miller*, 983 F. Supp. 2d 423, at *26 (D. Vt. 2013) ("participation in sporting events does not establish 'continuous and systematic' contact"); *Duchesneau v. Cornell Univ.*, No. 08-4856, 2009 U.S. Dist. LEXIS 19125, at *15-20 (E.D. Pa. Feb. 26, 2009) (no general jurisdiction in Pennsylvania where Cornell engaged in recruiting and alumni activities in Pennsylvania, and its teams participated in athletic events in Pennsylvania).

- Maintaining active alumni groups in the forum state. *Snodgrass*, 2013 U.S. Dist. LEXIS 92618, at *11 ("[I]t cannot be that any university can be haled into court for any claim in any state where it has an alumni association.").

- Having an externship program involving the forum state or an exchange program that allows students to spend a semester in the forum state. *Meyer*, 2014 U.S. Dist. LEXIS 68510, at *7-8 (finding no general jurisdiction in New York where defendant university recruited students from New York; solicited and received contributions nationwide, including from New York residents; had an exchange program that allowed its students to spend a semester at New York University, and stating: "[L]ong before *Daimler* such activities were insufficient to subject a nationally prominent university to general jurisdiction in this state."); *Kurzon LLP v. Thomas M. Cooley Law Sch.*, No. 12CV8352-LTS-RLE, 2014 U.S. Dist. LEXIS 85776, at *12-14 (S.D.N.Y. June 24, 2014) (no general jurisdiction in New York where Cooley had solicited donations from New York alumni and applications for admission from New York students; had sent representatives to school fairs in New York; and had externship sites for students in New York).

DOCUMENT PREPARED
ON RECYCLED PAPER

- Advertising in the forum state. *Gehling*, 773 F.2d at 542.

- Allowing prospective students to submit applications online. *Am. Univ.*, 858 F. Supp. 2d at 715.

- Having an interactive website, even one that facilitates sales and donations. *Mavrix Photo*, 647 F.3d at 1226 ("[Defendant's] operation of an interactive website -- even a 'highly interactive' website -- does not confer general jurisdiction."); *Am. Univ.*, 858 F. Supp. 2d at 714-15 (none of defendant university's internet activity, including maintaining an "interactive" website through which it advertised and sold products to Texas residents, solicited students and donations, facilitated payment, and provided information about recruiting and alumni events in Texas, justified the exercise of general personal jurisdiction over the university—"a traditional 'brick and mortar' university with a physical campus in Washington, D.C."—in Texas).

- Sales and sales promotion in the forum state. *Am. Univ.*, 858 F. Supp. 2d at 714-15 (no general jurisdiction in Texas where it was undisputed that defendant university advertised and directly sold products to Texas residents over its website); *see also Goodyear*, 131 S. Ct. at 2855, 2857, n. 6. (the mere fact that a company's products are regularly sold in the forum state does not itself give rise to general jurisdiction); *Hid Global*, 2014 U.S. Dist. LEXIS 56024, at *9 ("Hundreds of thousands of dollars in business over the course of thirteen years is similarly uninformative, and more must be shown than regular purchases.").

The reasoning of the university cases is clear: finding general jurisdiction where the institution's contacts with the forum state are its involvement in activities that are typical of a nationally prominent out-of-state university would render all such institutions subject to general jurisdiction in most, if not all states. *See, e.g.*,

1 | *Duchesneau*, 2009 U.S. Dist. LEXIS 19125, at *19-20; *Ferris v. Rollins College*
2 | *Inc.*, No. 1:08-cv-00039-SPM-AK, 2008 U.S. Dist. LEXIS 109791, at *8-11 (N.D.
3 | Fla. Oct. 9, 2008).

4 |      The established case law regarding out-of-state universities and general
5 | jurisdiction plainly refutes each of Plaintiff's jurisdictional allegations as a basis for
6 | general jurisdiction.  (*See* Dkt. 1 ¶¶ 28-34.)  This case law, in tandem with the
7 | Supreme Court's recent pronouncement that general jurisdiction should be limited
8 | to jurisdictions where the foreign company is "at home" (*i.e.*, its principal place of
9 | business and state of incorporation), confirms that Duke is not subject to general
10 | jurisdiction in California. *See Hershman v. Muhlenberg College*, No.
11 | 3:13CV00594(RNC) OP, 2013 U.S. Dist. LEXIS 157343, at *5-6 (D. Conn. Nov.
12 | 4, 2013) (finding Muhlenberg College was not "essentially at home" anywhere
13 | except Pennsylvania, its state of incorporation, principal place of business, and site
14 | of its only campus).

15 | ### 2.    Duke Is Not Subject to Specific Jurisdiction in California
16 |      Specific jurisdiction is similarly lacking.   For specific jurisdiction over a
17 | defendant to exist, three conditions must be met:

18 |      (1) The defendant must have "performed some act or consummated some
19 | transaction within the forum or otherwise purposefully availed [itself] of the
20 | privilege of conducting activities in the forum";

21 |      (2)    The claim "arises out of or results from the defendant's forum-related
22 | activities"; and

23 |      (3)    "[T]he exercise of jurisdiction is reasonable."
24 | *Mattel, Inc. v. Greiner & Hausser GmbH*, 354 F.3d 857, 863 (9th Cir. 2003)
25 | (internal quotation marks and citation omitted).   Here, there is no specific
26 | jurisdiction because Plaintiff's declaratory judgment action does not arise out of
27 | any activities by Duke in California and because exercising jurisdiction would be
28 | unreasonable and unjust.

DOCUMENT PREPARED
ON RECYCLED PAPER

### a.    Plaintiff's claims do not arise out of Duke's forum-related activities

The Ninth Circuit employs a "but for" test to determine whether a claim arises out of or results from a defendant's forum-related activities; that is, but for the defendant's contacts with California, would the plaintiff's claims have arisen? *Mattel*, 354 F.3d at 864.  Here, Plaintiff's lawsuit alleges no facts that address this test or otherwise show that any specific conduct by Duke in California is the basis for this suit.  Indeed, Plaintiff appears to premise personal jurisdiction entirely on general jurisdiction. (Dkt. 1 ¶¶ 28-34.)

To the extent Plaintiff is relying on the existence of the opposition proceedings before the TTAB, opposition proceedings **in Alexandria, Virginia** provide no basis for specific jurisdiction over Duke **in California**.  (*See* Olive Decl. ¶ 5.)  The opposition is not a "contact" with or activity in California.

To the extent Plaintiff is relying on correspondence made by Duke or its counsel in North Carolina and directed to Plaintiff in California concerning Plaintiff's proposed marks, case law is clear that such correspondence—even if it consisted of cease and desist letters (which it did not in this case)—does not confer specific jurisdiction and did not give rise to Plaintiff's declaratory judgment action as a matter of law.[8]

---

[8] The parties have long engaged in discussions in an attempt to avoid confusion between their respective marks.  Duke had assumed that Plaintiff would continue to engage in good faith attempts to define its parameters of actual use, and to actually use its marks in ways that would avoid confusion regardless of the more comprehensive registrations it might seek.  Duke does not believe that any correspondence it transmitted should properly be described as a "cease and desist letter." (Olive Decl. ¶ 11; Hendricks Decl. ¶ 24.)

Even if "cease and desist" letters had been exchanged, however, such an exchange would not support specific jurisdiction.  *See Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1208 (9th Cir. 2006) ("A cease and desist letter is not in and of itself sufficient to establish personal jurisdiction over the sender of the letter."), *cert. denied*, 547 U.S. 1163 (2006);

1   Because it is clear Plaintiff's claims do not arise out of any activity by Duke

2   in California (*see* Hendricks Decl. ¶ 24; Olive Decl. ¶ 12), specific jurisdiction does

3   not exist.

4               **b.      The exercise of jurisdiction would be unreasonable**

5                        **and unjust**

6       Finally, even if a defendant otherwise has "minimum contacts" within the

7   forum state, due process requires that the exercise of jurisdiction in a particular

8   case—whether it be general or specific jurisdiction—"must comport with fair play

9   and substantial justice, i.e. it must be reasonable." *Mavrix Photo*, 647 F.3d at 1228

10  (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir.

11  2004)); *Amoco Egypt Oil Co. v. Leonis Navigation Co., Inc.*, 1 F.3d 848, 851, n. 2

12  (9th Cir. 1993).   Courts in the Ninth Circuit consider the following factors in

13  determining reasonableness:

14          "the extent of purposeful interjection, the burden on the defendant to

15          defend the suit in the chosen forum, the extent of conflict with the

16          sovereignty of the defendant's state, the forum state's interest in the

17          dispute; the most efficient forum for judicial resolution of the dispute;

18          the importance of the chosen forum to the plaintiff's interest in

19          convenient and effective relief; and the existence of an alternative

20          forum."

21  *Amoco Egypt Oil*, 1 F.3d at 851 (quoting *Shute v. Carnival Cruise Lines*, 897 F.2d

22  377, 386 (9th Cir. 1990), *rev'd on other grounds*, 499 U.S. 585 (1991)).

23  

24  *Douglas Furniture Co. of Cal., Inc. v. Wood Dimensions, Inc.*, 963 F. Supp. 899,

25  902-03 (C.D. Cal. 1997) ("[L]etters threatening litigation are unrelated to the

    subject matter of the actual controversy, which is whether the declaratory judgment

26  defendant has intellectual property rights that have been infringed by the

    declaratory judgment plaintiff."); *see also Hid Global*, 2014 U.S. Dist. LEXIS

27  56024, at *10-18 (no specific jurisdiction conferred in patent declaratory judgment

28  action).

40845978.10

- 16 -

DOCUMENT PREPARED
ON RECYCLED PAPER

1   Here, the bulk of the pertinent factors favor a finding of no jurisdiction, and

2   other considerations demonstrate that exercising jurisdiction over Duke would

3   offend traditional notions of fair play and substantial justice.  Any "purposeful

4   interjection" into California by Duke has been quite limited and is unrelated to this

5   case, as discussed in the prior section; the burden of defending suit in California

6   clearly is heavier than defending suit in Duke's home forum in the Middle District

7   of North Carolina (*see generally* Hendricks Decl.); the Middle District of North

8   Carolina is an alternative forum (*see infra.* p. 20); and North Carolina's interest in

9   this dispute is significantly greater than California's interest, as this suit concerns

10  the strength of and protections to be afforded the trademarks of a North Carolina

11  institution.

12  More generally, as a trademark owner, Duke risks losing or diminishing its

13  trademark rights if it fails to oppose marks that may be confusingly similar.

14  Asserting jurisdiction here would impede enforcement of intellectual property

15  rights by signaling that every trademark opposition filed with the U.S. Patent and

16  Trademark Office would automatically result in personal jurisdiction wherever the

17  applicant resides.   Such a result is neither reasonable nor just.   *See Douglas*

18  *Furniture*, 963 F. Supp. at 903 ("It would be unreasonable to require an intellectual

19  property owner to risk having to submit to the jurisdiction of an alleged infringer in

20  order to exercise his rights.").

21  Similarly, courts recognize there are other important policy reasons for

22  enforcement-related correspondence, such as fostering settlement, which make it

23  unreasonable to exercise personal jurisdiction based on such correspondence.[9]

24  _____

25  [9] *See, e.g.*, *Yahoo!*, 433 F.3d at 1208 ("If the price of sending a cease and desist

26  letter is that the sender thereby subjects itself to jurisdiction in the forum of the
    alleged rights infringer, the rights holder will be strongly encouraged to file suit in

27  its home forum without attempting first to resolve the dispute informally by means
    of a letter."); *Bandai Am., Inc. v. Brown*, No. CV 00-13364 WMB, 2001 U.S. Dist.

28  LEXIS 24280, at *20 (C.D. Cal. June 1, 2001) ("[I]t would be unreasonable to hold

40845978.10                                            - 17 -

DOCUMENT PREPARED
ON RECYCLED PAPER

1   Because neither general nor specific jurisdiction exists, and because the

2   exercise of jurisdiction over Duke here would be unreasonable and unjust, this case

3   must be dismissed.

4   ## B.   This Suit Should Be Dismissed for Improper Venue

5   Plaintiff's suit also should be dismissed because venue in California is

6   improper.   The concept of venue is designed to protect the **defendant** against a

7   plaintiff's choice of an unfair or inconvenient forum.   *Atl. Marine Constr. Co., Inc.*

8   *v. United States Dist. Court*, 134 S. Ct. 568, 582 n. 7 (2013).   Venue is proper only

9   in a judicial district where: (1) "any defendant resides, if all defendants are

10  residents of the State in which the district is located;" (2) "a substantial part of the

11  events or omissions giving rise to the claim occurred, or a substantial part of

12  property that is the subject of the action is situated"; or (3) "any judicial district in

13  which any defendant is subject to the court's personal jurisdiction" if "there is no

14  district in which an action may otherwise be brought[.]"   28 U.S.C. § 1391(b)

15  (2014).[10]

16  Plaintiff bears the burden to show that venue is proper in this District and, in

17  determining if it has done so, "'the pleadings need not be accepted as true and the

18  court may consider facts outside the pleadings."   *Prawoto v. Primelending*, 720 F.

19  Supp. 2d 1149, 1151 (C.D. Cal. 2010) (quoting *Murphy v. Schneider Nat'l, Inc.*,

20  349 F.3d 1224, 1229 (9th Cir. 2003) and citing *Piedmont Label Co. v. Sun Garden*

21  *Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979)).

22  First, Duke does not reside in California, so venue is not proper in this

23  District under subsection (b)(1).   For venue purposes, a corporate defendant resides

24  that [the defendant's] options were limited to either filing suit in Texas without

25  attempting to reach an out-of-court resolution with Bandai [the plaintiff], or

26  subjecting himself to jurisdiction in a distant state merely by informing Bandai of

    his rights and of his belief that Bandai infringed upon them.").

27  [10] The general venue statute applies to trademark-related claims.   *Golden Scorpio*

28  *Corp. v. Steel Horse Bar & Grill*, 596 F. Supp. 2d 1282, 1286 n. 3 (D. Ariz. 2009).

DOCUMENT PREPARED
ON RECYCLED PAPER

1    in any judicial district in which it is subject to personal jurisdiction.  28 U.S.C. §

2    1391(c)(2).   As discussed in the prior section, Duke is not subject to personal

3    jurisdiction in California.

4        Second, under subsection (b)(2), venue is not proper in this District because

5    (also as discussed above) Plaintiff's claims against Duke did not arise from events

6    or omissions by Duke in this District.  While subsection (b)(2) also allows plaintiffs

7    to bring suit in the district in which a substantial part of property that is the subject

8    of the action "is situated," this provision is not implicated here, as this suit concerns

9    intellectual property, not physical property.  *See* Seigel, D., Commentary on 1988

10   and 1990 Revisions of Section 1391, printed at 28 U.S.C.A. § 1391 (Thomson

11   Reuters 2014) (the second clause of former § 1391(a)(2)—now, § 1391(b)(2)—

12   "manifests that the physical presence of property can ground venue when the

13   property is the very subject of the suit").[11]

14       Third, venue is not proper in this District pursuant to subsection (b)(3)

15   because there is a "district in which [the] action may otherwise be brought,"

16   namely, the Middle District of North Carolina, as Duke is subject to personal

17   jurisdiction there.  (*See* Hendricks Decl. ¶ 2.)  Subsection (b)(3), therefore, does not

18   apply.  *See Atl. Marine*, 134 S. Ct. at 578 (section 1391(b)(3) only applies "[i]f no

19   other venue is proper").

20       Because this case does not fall into any of the three categories under 28

21   U.S.C. § 1391(b), venue is improper, and the case should dismissed.

22

23

24

25

26

---

27   [11] This commentary is included in Exhibit B.   The sentence referenced above

28   appears on page 11.

DOCUMENT PREPARED
ON RECYCLED PAPER

## IV.   **CONCLUSION**

Venue is not proper in this District, and the Court lacks personal jurisdiction over Duke.   Accordingly, Duke respectfully requests that the Court dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(2) and/or 12(b)(3) and grant Duke such further relief as the Court deems just.

Dated:        August 7, 2014                JOHN A. O'MALLEY
                                            CRISTINA C. LONGORIA
                                            **FULBRIGHT & JAWORSKI LLP**


                                            By  /s/ John A. O'Malley
                                            JOHN A. O'MALLEY
                                            Attorneys for Defendant
                                            DUKE UNIVERSITY

DOCUMENT PREPARED
ON RECYCLED PAPER

# EXHIBIT  A

THIS DISPOSITION IS NOT
CITABLE AS PRECEDENT
OF THE TTAB

Hearing:
May 29, 2003

Paper No. 97

Mailed:  8/21/03

## UNITED STATES PATENT AND TRADEMARK OFFICE

_____

### Trademark Trial and Appeal Board

_____

Duke University
v.
Haggar Clothing Co.

_____

Opposition No. 108,304
to application Serial No. 75/113,735
filed on June 4, 1996

_____

Susan Freya Olive of Olive & Olive, P.A. for Duke
University.

Priscilla L. Dunckel of Baker Botts LLP  for Haggar Clothing
Co.

_____

Before Cissel, Quinn and Walters, Administrative Trademark
Judges.

Opinion by Cissel, Administrative Trademark Judge:

On June 4, 1996, applicant filed the above-referenced
application to register the mark "DUKE AMERICA" on the
Principal Register for "wearing apparel, namely, men's and
boys (sic) pants, jeans, shorts, belts, shirts, suits,
jackets, coats, vests, sweaters, neckties, swimwear, socks,
underwear and hats," in Class 25.  The stated basis for
filing the application was applicant's assertion that it
possessed a bona fide intention to use the mark in commerce

Opposition No. 108,304

in connection with the goods listed in the application.  The application was examined and the mark was passed to publication with a disclaimer of the geographically descriptive word "AMERICA."

A timely Notice of Opposition was filed by Duke University on November 7, 1997.  As grounds for opposition, opposer alleged that "DUKE AMERICA" so resembles opposer's famous "DUKE" marks, which have been used in connection with identical goods, that if it were used in connection with the clothing items listed in the application, confusion or mistake would be likely.  In its answer, applicant denied the essential allegations set forth in the Notice of Opposition.

A trial was conducted in accordance with the Trademark Rules of Practice.  Much of the results of the discovery conducted by the parties was made of record, either by notices of reliance or as exhibits to testimonial depositions.  In addition to documentary and written discovery, each party took the deposition of a designated representative of the other.  During the trial, Duke deposed fourteen individuals and filed a Notice of Reliance on eighty items, including the discovery deposition, with exhibits, of Alan Burks, applicant's Vice President.  During its own testimony period, applicant also took the testimony of Mr. Burks, as well as the testimony of employees of three

EXHIBIT A
23

Opposition No. 108,304

third parties, Royal Textile Mills, Inc., Haband Company and the James Madison University Foundation, Inc..

On the last day of applicant's testimony period, applicant filed a notice of reliance on thirty-seven additional items, including the affidavit, with exhibits, of a paralegal employee of counsel for applicant.  Opposer objected to the Board's consideration of this affidavit and the exhibits to it.  Although applicant subsequently asked opposer to consent to the introduction of this testimony and exhibits, opposer did not consent.  In view of this fact, we have not considered it.  See Trademark Rule 2.123(b). Accordingly, opposer's objection to the affidavit and its exhibits is sustained.

The other matter that requires explanation prior to our discussion of the determination of this opposition on its merits is applicant's objection to our consideration of the testimony of opposer's expert witness, Mr. McBride, and to the survey he conducted.  Opposer presented this testimony and evidence (as well as two other depositions to which applicant has not objected) as rebuttal, i.e., after opposer had presented its case in chief during its testimony period, and after applicant had responded to opposer's claims and evidence during applicant's testimony period.  Resolution of applicant's timely made objection was properly deferred until final decision, as the parties were advised at the

3

Opposition No. 108,304

time applicant first objected to Mr. McBride's testimony and the survey upon which it is based, and applicant and opposer both argued this issue in their respective briefs and at the oral hearing.

The issue is whether opposer's survey and the testimony that explains it were proper rebuttal as responsive to applicant's asserted defenses, or, as applicant asserts, this testimony and these exhibits could only have been presented as part of opposer's case in chief.

The survey was designed to determine whether the third-party uses shown by applicant during its testimony period have diluted the fame of opposer's "DUKE" mark for clothing, and whether, as applicant argues its testimony and evidence shows, such third-party uses of similar marks have created a marketplace in which confusion between opposer's mark and the mark applicant seeks to register would not be likely.

The survey employed standard mall intercept methodology.  It was conducted at locations outside North Carolina, where opposer's main campus is located, and away from other schools in opposer's athletic league.  One of the sites was in applicant's home state of Texas.  Others were spread across the country, from Florida to California, including locations in Arizona, Massachusetts, Ohio and Minnesota.

4

Opposition No. 108,304

Qualified respondents were shown an ordinary t-shirt of the type actually sold by Duke University, bearing either the mark "DUKE" or the mark "DUKE AMERICA."  Respondents were asked questions about the shirt they were shown.  First they were asked what came to mind when they saw the name on the shirt.  Then they were asked whether they thought it was likely that the shirt was endorsed by or associated with the entity that they had identified responsive to the first question.  Additionally, the surveyor asked the respondents why they had answered the way they did.

Opposer contends that the survey disproves applicant's contention that the strength of opposer's mark has been diluted by third-party uses of similar marks.  Almost three quarters of the qualified respondents associated opposer with the shirt bearing the "DUKE" mark, and 84 percent of those people believed the university either endorsed or was associated with these shirts.  Significantly, almost two-thirds of the respondents associated opposer with the shirts bearing the "DUKE AMERICA" mark, and 71 percent of those people thought the university had endorsed or was associated with them.  Based on the results of this survey, opposer contends that in spite of the purported diluting effects of the third-party uses demonstrated by applicant, opposer's "DUKE" mark is strongly associated with opposer, and a large portion of the potential purchasers of applicant's shirts

5

Opposition No. 108,304

would assume that the mark applicant seeks to register,
"DUKE AMERICA," would indicate that the shirts were endorsed
by or associated with opposer.  Significantly, none of the
businesses shown by applicant to be using marks consisting
of or including "DUKE" were identified by participants in
connection with either the "DUKE" or the "DUKE AMERICA"
branded shirts.  Other than opposer, no entity achieved
statistically significant recognition in this regard.

　　　There is no question that Mr. McBride's testimony and
the survey he conducted would have been appropriate to
present as part of opposer's case in chief.  Neither party
contests this fact.  Applicant argues that once opposer
failed to conduct and introduce the survey during its
testimony period, however, opposer could not thereafter
introduce it.  Applicant argues that because the survey goes
directly to the issue of whether applicant's mark is likely
to cause confusion with opposer's mark, the only appropriate
time for the survey to be introduced was during opposer's
testimony period, and that if opposer is allowed to get the
survey and accompanying testimony into the record after
applicant had responded to opposer's claims and supporting
testimony and evidence, applicant would effectively be
precluded from responding to the survey with evidence and
testimony from its own expert.  In this regard, applicant
contends that it was not even given enough notice and

EXHIBIT A
27

**Opposition No. 108,304**

information about the survey to prepare properly for Mr.
McBride's deposition.

After careful consideration of the arguments of both
parties, we have decided to consider this testimony and
evidence because it is proper rebuttal under the
circumstances presented by this case.  During its initial
testimony period, opposer had the burden of establishing its
standing; of establishing its ownership of the marks with
which it contends applicant's mark would be likely to cause
confusion; of establishing use of these marks before
applicant filed the application to register the mark it
seeks to register; and of establishing a prima facie case of
likelihood of confusion based on the similarity of the marks
and the relationship between opposer's goods and the goods
with which applicant intends to use the mark it seeks to
register.

As discussed below, opposer met this burden of proof,
but, as opposer points out, opposer was not required to
anticipate or guess what grounds of defense might be raised
by applicant, or to counter those grounds of defense prior
to their assertion.  Dilution was not raised by applicant as
a defense in its answer to the Notice of Opposition.  When
applicant presented testimony concerning the alleged
dilution of opposer's marks, opposer properly rebutted the
dilution defense asserted by applicant with three

EXHIBIT A
28

Opposition No. 108,304

depositions, one of which is the deposition of Mr. McBride to which applicant objects.  Under these circumstances, his testimony and the exhibits to it are admissible as rebuttal testimony.

Applicant's assertion that it was denied the opportunity to cross-examine the witness effectively is also not well taken.  As the record shows, opposer fully complied with applicant's discovery requests, as well as with the agreement between applicant and opposer that opposer would not introduce at Mr. McBride's deposition any documents containing new information beyond that contained in documents provided by opposer to applicant prior to the deposition.  This record shows that applicant had fair notice of and adequate time to prepare for Mr. McBride's deposition, and that applicant was given in advance the information it needed to cross-examine the witness effectively.

Applicant's substantive criticisms of the survey evidence presented by opposer are not well taken either. For example, applicant argues that the survey was unfair because the shirts on which the marks were shown to the survey respondents were identical to shirts on which opposer's mark is actually used.  Applicant expressed outrage at this fact and concluded that it should come as no surprise that respondents were confused when applicant's

EXHIBIT A
29

Opposition No. 108,304

mark was used on opposer's goods.  This argument
conveniently overlooks the fact that as identified in the
application, applicant's goods encompass the goods on which
opposer has used its mark.  Applicant's other objections to
the survey and to Mr. McBride's status as an unbiased expert
witness are similarly without merit.  Because applicant
shows its mark in typed format in the application, applicant
would be free to adopt any style of lettering it chooses, so
the fact that the shirts used in the survey present the
marks in block letters does not invalidate the results of
the survey.  Similarly, in view of the absence in the
application of restrictions or limitations as to the types
of shirts, for example, the channels of trade through which
they will move, and the purchasers applicant plans to target
with its advertising for its goods, opposer was under no
obligation to use only high-end items of apparel or to
choose only well off, sophisticated consumers for its
survey.

    In any event, because opposer had already met its
burden of establishing that confusion would be likely if
applicant were to use the mark it seeks to register in
connection with the goods listed in the application, and
because applicant's testimony and evidence do not overcome
the prima facie case established by opposer, even if we did
not consider Mr. McBride's testimony and the exhibits to it,

EXHIBIT A
30

Opposition No. 108,304

we would still reach the same conclusion on the merits of this proceeding.

Both applicant and opposer agree that the case of In re E.I. duPont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973), establishes the test for determining whether confusion would be likely.  In that case, the Court listed the principal factors to be considered in resolving this issue.  Chief among these factors are the similarity of the marks as to appearance, pronunciation, meaning and commercial impression and the similarity of the goods.

The record shows that opposer is a famous private university, which provides a top-notch education to undergraduate students as well as to post-graduate students in many fields, including medicine, business and law. Duke's intercollegiate basketball program is at least as well known as the university's academic prowess.  Since 1925, the university has used the mark "DUKE" in connection with its activities, including the sale of men's and boys' pants, belts, shirts, jackets, sweaters, neckties and socks. Opposer owns a half dozen registrations for marks which include the name "DUKE," but opposer's rights in "DUKE" alone for these clothing items are common law rights based on opposer's use of the mark in commerce in connection with these products.  Although opposer has not used the precise mark applicant seeks to register, opposer did sell a shirt

10

EXHIBIT A
31

Opposition No. 108,304

bearing both the word "DUKE" and the letters "U.S.A." prior to the filing date of the opposed application.

Applicant, Haggar Clothing Co., is a manufacturer of apparel. Its headquarters are in Dallas, Texas. Applicant intends to use the mark "DUKE AMERICA" on a line of high-end, relatively expensive clothing which is to include pants, jeans, shorts, belts, shirts, suits, jackets, coats, vests, sweaters, neckties, swimwear, socks, underwear and hats, all for men and boys. Applicant asserts that it selected "DUKE AMERICA" to identify a fictitious person who represents a particular lifestyle that consumers will want to emulate. Applicant's promotional plan is based around this freewheeling character, a photographer who roams the country taking pictures of interesting things.

The evidence and argument presented by applicant in this regard, however, is immaterial. Potential purchasers of applicant's goods bearing the mark sought to be registered would not necessarily be aware that the mark is supposed to be the name of this fictitious character or of the reasons applicant selected its mark, and the application does not limit or restrict the goods with regard to their cost, the channels of trade through which they will move, or the sophistication or knowledge of the purchasers of such goods. Under these circumstances, therefore, we must consider the items of clothing identified in the application

11

EXHIBIT A
32

Opposition No. 108,304

to include all types of such products, and, as opposer
points out, because opposer has used its mark on "shirts,"
"hats" and other items of apparel, we must consider the
goods with which applicant intends to use its mark to be
identical to those on which opposer has used its mark.

"When marks would appear on virtually identical goods
or services, the degree of similarity between the marks
necessary to support a conclusion of likely confusion
declines."  Century 21 Real Estate Corp. v. Century Life of
America, 970 F.2d 874, 23 USPQ 6098, 1700 (Fed. Cir. 1982).

Opposer has established that Duke is a famous school
and that people expect schools to endorse t-shirts, which
are encompassed within Haggar's identification of goods.
Opposer does in fact license the use of its mark in
connection with such use and also in connection with other
clothing goods.  The evidence of sales and promotion of
apparel items under opposer's mark supports opposer's claim
that its mark is famous.  There is no question that if
applicant were to use "DUKE" on such products, confusion
would be likely.

The issue thus becomes whether the addition of the
geographically descriptive, disclaimed word "AMERICA" is
sufficient to avoid the likelihood of confusion.  We hold
that it is not.  This record does not establish any basis
for concluding that prospective purchasers of these clothing

12

Opposition No. 108,304

items would assume that "DUKE AMERICA" is anyone's name, much less that they would necessarily be familiar with the fictitious character which will be featured in the advertising campaign that applicant plans to use in promoting its new line of clothing.  To the contrary, in view of the renown of opposer's "DUKE" mark, it is likely that the addition of the word "AMERICA" would be viewed either as an indication of where the university is or as an attempt to link the university with patriotism.  In either event, the primary indicator of the secondary source of t-shirts bearing the mark "DUKE AMERICA" would be the name "DUKE," which opposer has used and promoted for more than three quarters of a century.

The fame of opposer's mark has been clearly established, and it plays a significant role in our analysis of the likelihood of confusion.  See: Bose Corp. v. QSC Audio Products Inc., 293 F.3d 1367, 63 USPQ2d 1303 (Fed. Cir. 2002);  Recot, Inc. v. M. C. Becton, 214 F.3d 1322, 54 USPQ2d 1894 (Fed. Cir. 2000); Century 21 Real Estate Corp. v. Century Life of America, 970 F.2d 874, 23 USPQ2d 1698 (Fed. Cir. 1992); and Kenner Parker Toys, Inc. v. Rose Art Industries, Inc., 963 F.2d 350, 22 USPQ2d 1453 (Fed. Cir. 1992).  Especially in view of the fame of opposer's mark, the use of the mark applicant seeks to register would be likely to cause confusion.

13

EXHIBIT A

34

Opposition No. 108,304

   As noted above, applicant argues that third-party use
of opposer's mark has resulted in a marketplace which is so
crowded with "DUKE" marks that purchasers readily
distinguish among them.  In support of its claim that the
source-identifying significance of opposer's mark is
diluted, during its testimony period applicant made of
record evidence of the use of a number of marks consisting
of or incorporating the name "DUKE" for a variety of goods
and services.  Although some of this evidence is irrelevant
because the marks in their entireties are dissimilar or the
marks consist of or incorporate "DUKES," rather than
"DUKE,"[1] the evidence submitted by applicant does establish
that two entities, Royal Textiles, Inc. and Haband Company,
Inc., have used "DUKE" marks in connection with particular
items of clothing for some time, apparently without causing
any confusion.  Royal Textiles has used and registered
"DUKE," "LADY DUKE" and "DUKE" and a design, and has
established through use rights in the mark "DUKE ATHLETIC
PRODUCTS."  Haband has also used the mark "DUKE" in
connection with clothing items for years, apparently without
causing any actual confusion.

   A closer look at the goods and the channels of trade
through which Royal Textiles' products have moved undercuts
applicant's argument that these third-party uses of similar

_____
[1] e.g., "Duluth-Superior Dukes," "DUKE BOYD," "DUKE KAHANAMOKU,"

EXHIBIT A
35

Opposition No. 108,304

marks on related goods have resulted in the dilution of opposer's famous mark.  Royal Textiles, for example, does sell t-shirts, but this activity is conducted within the same channels of trade that the corporation uses for its athletic supporters and other sports equipment.  All but a small percentage of such shirts are sold to athletic teams in bulk, with the team names to be printed on them by whoever purchases them.  It is not surprising that the sports organizations which purchase their equipment and clothing from Royal Textiles do not view the tag bearing either the name "DUKE" or the name "DUKE ATHLETIC PRODUCTS" as an indication that Duke University has sponsored were endorsed these goods.

While applicant has established that Haband has used and promoted "DUKE" as a mark on its items of apparel for a number of years, such use by a single entity does not mandate that we must conclude that the source-identifying significance of opposer's famous mark has become diluted.

In summary, opposer has met its burden of establishing prior use of its mark; that its mark is famous, and that the mark applicant seeks to register so resembles opposer's mark that if it were to be used in connection with the goods specified in the application, which are identical to goods on which opposer has previously used its famous mark,

---

"THE DUKES OF HAZARD," and the James Madison University "DUKES."

15

Opposition No. 108,304

confusion would be likely.  Applicant's evidence of lack of
distinctiveness falls short of establishing that prospective
purchasers of apparel are so familiar with third-party uses
of "DUKE" in connection with these goods that they would not
mistakenly assume that the mark "DUKE AMERICA" is an
indication that the clothing bearing it is endorsed by, or
associated with, Duke University.

At the conclusion of applicant's brief, applicant
quoted from Trademark Rule 2.133(b), which was promulgated
to implement the amendment to Section 18 of the Act allowing
a party to amend its application to reflect the realities of
the commercial activity being conducted under a particular
mark.  Applicant cites this rule in support of its request
that if the Board determines that applicant's mark is not
entitled to registration in the absence of trade channel
restrictions and/or limitations with respect to the
customers for the goods, applicant should be allowed to make
such amendments to the identification-of-goods clause in the
application.

As opposer points out, applicant has not yet used the
mark it seeks to register, so it has established no channels
of trade and no customer base for its goods.  This case was
tried by the parties based on the application as filed,
without any such limitations or restrictions, so the
proposed amendment to the application is plainly untimely at

EXHIBIT A
37

**Opposition No. 108,304**

this juncture.  See TMBP Section 311.  See also Eurostar, Inc. v. "Euro-Star" Reitmoden GmbH & Co. KG, Spezialfabrik Fur Reitbekleidung, 43 USPQ2d 1266 (TTAB 1994) and Pegasus Petroleum Corp. v. Mobil Oil Corp., 227 USPQ 1040 (TTAB 1985).  Opposer correctly took the position that the evidence offered by applicant during the trial of the market channels it intends to use and the customers it plans to target was irrelevant because the application was not limited as to channels of trade or customers.  Applicant's request to amend is neither timely nor specific enough to have afforded opposer fair notice of the proposed restriction.  Opposer has not consented, either explicitly or by implication, to any such amendment.  Moreover, even if such an amendment were appropriate, the evidence does not support a finding that applicant's planned "DUKE AMERICA" clothing, no matter how it could be described and no matter how the clothing trade channels through which it will move could be identified, could avoid the likelihood of causing confusion with opposer's clothing bearing its famous "DUKE" mark.  Accordingly, applicant's request to be allowed to amend the application is denied.


DECISION: The opposition is sustained and registration to applicant is refused.

EXHIBIT A
38

# EXHIBIT  B

c

**Effective:[See Notes]**

United States Code Annotated Currentness
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
      Part IV. Jurisdiction and Venue (Refs & Annos)
         Chapter 87. District Courts; Venue (Refs & Annos)
         →→ **§ 1391. Venue generally**

**(a) Applicability of section.**--Except as otherwise provided by law--

  **(1)** this section shall govern the venue of all civil actions brought in district courts of the United States; and

  **(2)** the proper venue for a civil action shall be determined without regard to whether the action is local or transitory in nature.

**(b) Venue in general.**--A civil action may be brought in--

  **(1)** a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

  **(2)** a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

  **(3)** if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

**(c) Residency.**--For all venue purposes--

  **(1)** a natural person, including an alien lawfully admitted for permanent residence in the United States, shall be deemed to reside in the judicial district in which that person is domiciled;

  **(2)** an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question and, if a plaintiff, only in the judicial district in which it maintains its principal place of business; and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(3) a defendant not resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants.

(d) **Residency of corporations in States with multiple districts.**--For purposes of venue under this chapter, in a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State, and, if there is no such district, the corporation shall be deemed to reside in the district within which it has the most significant contacts.

(e) Actions where defendant is officer or employee of the United States--

(1) **In general.**--A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action. Additional persons may be joined as parties to any such action in accordance with the Federal Rules of Civil Procedure and with such other venue requirements as would be applicable if the United States or one of its officers, employees, or agencies were not a party.

(2) **Service.**--The summons and complaint in such an action shall be served as provided by the Federal Rules of Civil Procedure except that the delivery of the summons and complaint to the officer or agency as required by the rules may be made by certified mail beyond the territorial limits of the district in which the action is brought.

(f) **Civil actions against a foreign state**--A civil action against a foreign state as defined in section 1603(a) of this title may be brought--

(1) in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;

(2) in any judicial district in which the vessel or cargo of a foreign state is situated, if the claim is asserted under section 1605(b) of this title;

(3) in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality of a foreign state as defined in section 1603(b) of this title; or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(4) in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.

(g) Multiparty, multiforum litigation--A civil action in which jurisdiction of the district court is based upon section 1369 of this title may be brought in any district in which any defendant resides or in which a substantial part of the accident giving rise to the action took place.

CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 935; Oct. 5, 1962, Pub.L. 87-748, § 2, 76 Stat. 744; Dec. 23, 1963, Pub.L. 88-234, 77 Stat. 473; Nov. 2, 1966, Pub.L. 89-714, §§ 1, 2, 80 Stat. 1111; Oct. 21, 1976, Pub.L. 94-574, § 3, 90 Stat. 2721; Oct. 21, 1976, Pub.L. 94-583, § 5, 90 Stat. 2897; Nov. 19, 1988, Pub.L. 100-702, Title X, § 1013(a), 102 Stat. 4669; Dec. 1, 1990, Pub.L. 101-650, Title III, § 311, 104 Stat. 5114; Dec. 9, 1991, Pub.L. 102-198, § 3, 105 Stat. 1623; Oct. 29, 1992, Pub.L. 102-572, Title V, § 504, 106 Stat. 4513; Oct. 3, 1995, Pub.L. 104-34, § 1, 109 Stat. 293; Nov. 2, 2002, Pub.L. 107-273, Div. C, Title I, § 11020(b)(2), 116 Stat. 1827; Pub.L. 112-63, Title II, § 202, Dec. 7, 2011, 125 Stat. 763.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1948 Acts. Based on Title 28, U.S.C., 1940 ed., §§ 111, 112 (Mar. 3, 1911, c. 231, §§ 50, 51, 36 Stat. 1101; Sept. 19, 1922, c. 345, 42 Stat. 849; Mar. 4, 1925, c. 526, § 1, 43 Stat. 1264; Apr. 16, 1936, c. 230, 49 Stat. 1213).

Section consolidates section 111 of Title 28, U.S.C., 1940 ed., with part of section 112 of such title.

The portion of section 112 of Title 28, U.S.C., 1940 ed., relating to venue generally constitutes this section and the parts relating to arrest of the defendant, venue and process in stockholders' actions constitute sections 1401, 1693, and 1695 of this title.

Provision in section 111 of Title 28, U.S.C., 1940 ed., that a district court may proceed as to parties before it although one or more defendants do not reside in the district, and that its judgment shall be without prejudice to such absent defendants, was omitted as covered by Rule 19(b) of the Federal Rules of Civil Procedure.

Word "action" was substituted for "suit" in view of Rule 2 of the Federal Rules of Civil Procedure.

Word "reside" was substituted for "whereof he is an inhabitant" for clarity inasmuch as "inhabitant" and "resident" are synonymous. (See Ex parte Shaw, 1892, 12 S.Ct. 935, 145 U.S. 444, 36 L.Ed. 768; Standard Stoker Co., Inc. v. Lower, D.C., 1931, 46 F.2d 678; Edgewater Realty Co. v. Tennessee Coal, Iron & Railroad Co., D.C., 1943, 49 F.Supp. 807.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Reference to "all plaintiffs" and "all defendants" were substituted for references to "the plaintiff" and "the defendant," in view of many decisions holding that the singular terms were used in a collective sense. (See *Smith v. Lyon,* 1890, 10 S.Ct. 303, 133 U.S. 315, 33 L.Ed. 635; *Hooe v. Jamieson,* 1897, 17 S.Ct. 596, 166 U.S. 395, 41 L.Ed. 1049; and *Fetzer v. Livermore,* D.C.1926, 15 F.2d 462.)

In subsection (c), references to defendants "found" within a district or voluntarily appearing were omitted. The use of the word "found" made section 111 of Title 28, U.S.C., 1940 ed., ambiguous. The argument that an action could be brought in the district where one defendant resided and a nonresident defendant was "found," was rejected in *Camp v. Gress,* 1919, 39 S.Ct. 478, 250 U.S. 308, 63 L.Ed. 997. However, this ambiguity will be obviated in the future by the omission of such reference.

Subsection (d) of this section is added to give statutory recognition to the weight of authority concerning a rule of venue as to which there has been a sharp conflict of decisions. (See *Sandusky Foundry & Machine Co. v. De Lavaud,* 1918, D.C.Ohio, 251 F. 631, 632, and cases cited. See also *Keating v. Pennsylvania Co.,* 1917, D.C.Ohio, 245 F. 155 and cases cited.)

Changes were made in phraseology.

1962 Acts. Senate Report No. 1992, see 1962 U.S. Code Cong. and Adm. News, p. 2784.

1963 Acts. Senate Report No. 620, see 1963 U.S. Code Cong. and Adm. News, p. 1373.

1966 Acts. Senate Report No. 1752, see 1966 U.S. Code Cong. and Adm. News, p. 3693.

1976 Acts. House Report No. 94-1656, see 1976 U.S. Code Cong. and Adm. News, p. 6121.

House Report No. 94-1487, see 1976 U.S. Code Cong. and Adm. News, p. 6604.

1988 Acts. House Report No. 100-889, see 1988 U.S. Code Cong. and Adm. News, p. 5982.

1990 Acts. Senate Report No. 101-416, House Report Nos. 101-123, 101-512, 101-514, 101-734, 101-735, and Statement by President, see 1990 U.S. Code Cong. and Adm. News, p. 6802.

1991 Acts. House Report No. 102-322, see 1991 U.S. Code Cong. and Adm. News, p. 1303.

1992 Acts. House Report No. 102-1006 and Statement by President, see 1992 U.S. Code Cong. and Adm. News, p. 3921.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 8:14-cv-01020-DOC-AN   Document 10-1   Filed 08/07/14   Page 49 of 70   Page ID #:79

1995 Acts. House Report No. 104-181, see 1995 U.S. Code Cong. and Adm. News, p. 307.

2002 Acts. House Conference Report No. 107-685 and Statement by President, see 2002 U.S. Code Cong. and Adm. News, p. 1120.

References in Text

The Federal Rules of Civil Procedure, referred to in subsec. (e), are set out in this title.

Amendments

2011 Amendments. Subsec. (a). Pub.L. 112-63, § 202(1), rewrote subsec. (a), which formerly read: "**(a)** A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.".

Subsec. (b). Pub.L. 112-63, § 202(1), rewrote subsec. (b), which formerly read: "**(b)** A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.".

Subsec. (c). Pub.L. 112-63, § 202(1), rewrote subsec. (c), which formerly read: "**(c)** For purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. In a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State, and, if there is no such district, the corporation shall be deemed to reside in the district within which it has the most significant contacts.".

Subsec. (d). Pub.L. 112-63, § 202(1), rewrote subsec. (d), which formerly read: "**(d)** An alien may be sued in any district.".

Subsec. (e). Pub.L. 112-63, § 202(2), rewrote subsec. (e), which formerly read: "**(e)** A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or un-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

der color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (1) a defendant in the action resides, (2) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) the plaintiff resides if no real property is involved in the action. Additional persons may be joined as parties to any such action in accordance with the Federal Rules of Civil Procedure and with such other venue requirements as would be applicable if the United States or one of its officers, employees, or agencies were not a party.

"The summons and complaint in such an action shall be served as provided by the Federal Rules of Civil Procedure except that the delivery of the summons and complaint to the officer or agency as required by the rules may be made by certified mail beyond the territorial limits of the district in which the action is brought.".

Subsec. (f). Pub.L. 112-63, § 202(3), struck out "**(f)** A civil action" and inserted "**(f) Civil actions against a foreign state**--A civil action".

Subsec. (g). Pub.L. 112-63, § 202(4), struck out "**(g)** A civil action" and inserted "**(g) Multiparty, multiforum litigation**--A civil action".

2002 Amendments. Subsec. (g). Pub.L. 107-273, § 11020(b)(2), added subsec. (g).

1995 Amendments. Subsec. (a)(3). Pub.L. 104-34, § 1, substituted "any defendant is" for "the defendants are".

1992 Amendments. Subsec. (a)(3). Pub.L. 102-572, § 504, inserted ", if there is no district in which the action may otherwise be brought" after "action is commenced".

1991 Amendments. Subsec. (b). Pub.L. 102-198 substituted "in (1)" for "if (1)".

1990 Amendments. Subsec. (a). Pub.L. 101-650, § 311(a), substituted provision for bringing a civil action in "(1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which the defendants are subject to personal jurisdiction at the time the action is commenced" for former provision for bringing a civil action in the judicial district where all plaintiffs or all defendants reside, or in which the claim arose.

Subsec. (b). Pub.L. 101-650, § 311(b), substituted provision stating that a civil action "may, except as otherwise provided by law, be brought only if [sic] (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought" for former provision stating that a civil action "may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law".

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Subsec. (e). Pub.L. 101-650, § 311(3), substituted provision of cl. (2) for bringing a civil action in any district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the the subject of the action is situated for former cls. (2) and (3) for bringing a civil action in any judicial district in which the cause of action arose or any real property involved in the action is situated, respectively, and redesignated former cl. (4) as (3).

1988 Amendments. Subsec. (c). Pub.L. 100-702 added subsec. (c) and struck out former subsec. (c) which provided that a corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district be regarded as the residence of such corporation for venue purposes.

1976 Amendments. Subsec. (e). Pub.L. 94-574 provided that, in actions against the United States, its agencies, or officers or employees in their official capacities, additional persons may be joined in accordance with the Federal Rules of Civil Procedure and with other venue requirements which would be applicable if the United States, its agencies or one of its officers or employees were not a party.

Subsec. (f). Pub.L. 94-583 added subsec. (f).

1966 Amendments. Subsec. (a). Pub.L. 89-714, § 1, authorized a civil action to be brought in the judicial district in which the claim arose.

Subsec. (b). Pub.L. 89-714, § 1, authorized a civil action to be brought in the judicial district in which the claim arose.

Subsec. (f). Pub.L. 89-714, § 2, repealed subsec. (f) which permitted a civil action on a tort claim arising out of the manufacture, assembly, repair, ownership, maintenance, use, or operation of an automobile to be brought in the judicial district wherein the act or omission complained of occurred. Present provisions are now contained in subsecs. (a) and (b) of this section.

1963 Amendments. Subsec. (f). Pub.L. 88-234 added subsec. (f).

1962 Amendments. Subsec. (e). Pub.L. 87-748 added subsec. (e).

Effective and Applicability Provisions

2011 Acts. Amendments by Title II of Pub.L. 112-63 take effect upon the expiration of the 30 day period beginning on Dec. 7, 2011, and shall apply to actions commenced in U.S. District courts on or after such effective date and actions removed from State courts to U.S. District courts that had been commenced on or after such effective date, see Pub.L. 112-63, § 205, set out as a note under 28 U.S.C.A. § 1390.

EXHIBIT B
46

2002 Acts. Amendments by section 11020(b) of Pub.L. 107-273 shall apply to a civil action if the accident giving rise to the cause of action occurred on or after the 90th day after Nov. 2, 2002, see section 11020(c) of Pub.L. 107-273, set out as a note under 28 U.S.C.A. § 1369.

1992 Acts. Amendment by Pub.L. 102-572 effective Jan. 1, 1993, see section 1101(a) of Pub.L. 102-572, set out as a note under section 905 of Title 2, The Congress.

1988 Acts. Section 1013(b) of Title X of Pub.L. 100-702 provided that: "The amendment made by this section [amending this section] takes effect 90 days after the date of enactment of this title [Nov. 19, 1988]."

1976 Acts. Amendment by Pub.L. 94-583 effective 90 days after Oct. 21, 1976, see section 8 of Pub.L. 94-583, set out as a note under section 1602 of this title.

COMMENTARY ON 1988 AND 1990 REVISIONS OF SECTION 1391

*by David D. Siegel*

Section 1391 is big business in the federal courts. It's the basic venue statute, determining what district or districts an action may be brought in. Extensive changes were made in the section in 1988 and 1990, affecting subdivisions (a), (b), (c), and (e).

Subdivision (c), the provision governing the venue of actions against corporations, was amended in 1988 in the Judicial Improvements and Access to Justice Act (Pub.L. 100-702). The aim was apparently to restrict the plaintiff's venue choices somewhat, but in some cases it may have the opposite effect. It is treated below, after discussion of the amendments made in subdivisions (a) and (b).

Subdivisions (a), (b), and (e) of § 1391 were amended by the Judicial Improvements Act of 1990 (Pub.L. 101-650), a broader ranging and more ambitious enactment than the 1988 one, addressing and altering venue in actions involving parties generally. The 1990 act purports to adopt at least the fundamentals of the recommendations of the Federal Courts Study Committee, a committee set up under the 1988 act to make a study of the federal courts and recommend additional changes. See Siegel, Changes in Federal Jurisdiction and Practice Under the New Judicial Improvements and Access to Justice Act, 123 FRD 399, 402. There are substantial variations between what the committee advocated and what Congress adopted, however.

The changes are discussed in their subdivision sequence.

**Subdivision (a)**

Subdivision (a) is the statute that prescribes venue when the court's subject matter jurisdiction is based on the diversity of citizenship of the parties. Before an amendment made in 1966, a district was proper

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

venue in a diversity case if all plaintiffs or all defendants resided in it, and the "all" meant what it said. If no district could qualify as one in which "all" the plaintiffs or "all" the defendants resided, it was generally not a proper district of venue. This of course meant that a claim involving many parties could have no proper venue at all in the federal system even if the claim arose within the United States. A 1966 amendment sought to remedy this by adding the district "in which the claim arose" as a permissible alternative. After that, trouble on this score would supposedly be experienced only by the claim that arose outside the country.

Even in domestic cases, however, a problem was often met in determining what district the claim "arose" in, especially when the case had contacts with many districts. It would not suffice just to choose the district of any of the contacts: the statute referred to the district in which the claim "arose" and only those contacts that could be said to make the district the place where the claim "arose" would technically satisfy the statute. One district, in other words, had to be sought out as the one in which the claim arose.

The 1990 amendment struck all of the old venue statements in subdivision (a) and supplied a new statement altogether, hoping to cure some of the old problems. A major purpose of the Federal Courts Study Committee was to eliminate the option plaintiffs had in diversity cases to lay venue in the district of their own residence (an option that was not available under subdivision [b], which governs other categories of federal subject matter jurisdiction). In the first and most obvious of the 1990 changes, this option is removed from the diversity case.

Now diversity plaintiffs must turn to other options. As will be seen, however, and in what may be an irony, diversity plaintiffs may find in some situations under clause (3) of the new subdivision (a) a more generous allotment of venue choices than they had even under the superseded statute. That was not the committee's purpose, but it may well be a product of Congress's visiting with the committee's proposals.

### Subdivision (a), Clause (1)

The first venue offering of the new subdivision (a), that contained in clause (1), is a district where any defendant resides, but with the proviso that when there are several defendants, all of the defendants must be shown to reside in the same state. If they do, the district of residence of any one of them--this of course supposes that the state is among those divided into two or more districts--is a proper venue. (Subdivision [a] of a distinct statute, § 1392, also providing to this effect, may now be superfluous.) If they do not, however; if the defendants reside in different states, the defendant's-residence venue standard will not serve and the plaintiff will have to turn to one of the other criteria, relying on clause (2) or (3) of the new subdivision (a). Clause (3) should prove helpful in that situation, offering the district of defendant A's residence as proper venue against defendant B as well, even if B resides in another state, as long as B is amenable to personal jurisdiction in the district. (See the discussion of clause [3], below.)

### Subdivision (a), Clause (2)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Clause (2), modeled on the decades-old recommendation of the American Law Institute (see § 1303 in its 1969 Study of the Division of Jurisdiction Between State and Federal Courts), is designed to fill the gap left by the repeal of the "in which the claim arose" language. Its first part offers as proper venue the district in which a "substantial part of the events or omissions giving rise to the claim" took place. That language will doubtless pose its own problems and need fresh resolutions in some situations, but it does posit a standard that will require less pinpointing than the "in which the claim arose" language did.

The "claim arose" clause was usually held to demand that one place, and one place only, be pinpointed as the place where the claim "arose", and this was hard if not impossible to do in many cases. The U.S. Supreme Court itself had occasion to discourse on the problem in Leroy v. Great Western United Corp., 443 U.S. 173, 99 S.Ct. 2710 (1979), a case now made largely academic by the 1990 amendment of § 1391. The new language accepts venue in a district in which "a substantial part" of the activities (out of which the claim arose) took place, and there may be several districts that qualify as a situs of such "substantial" activities.

The fact that substantial activities took place in district B does not disqualify district A as proper venue as long as "substantial" activities took place in A, too. Indeed, district A should not be disqualified even if it is shown that the activities in B were more substantial, or even the most substantial. Any other approach would restore the pinpointing problem that created the difficulties under the now discarded "claim arose" standard. If the selected district's contacts are "substantial", it should make no difference that another's are more so, or the most so.

The House Report of the Committee on the Judiciary (Report 101-734, p. 23) said, in referring to the "substantial ... events" clause, that

> [t]he great advantage of referring to the place where things happened ... is that it avoids the litigation-breeding phrase "in which the claim arose".

While conceding that there may be an "advantage" in this new reference, it is best to reserve judgment on how "great" it is likely to be, at least insofar as the breeding of litigation is concerned, as any practicing lawyer can attest who is familiar with the procedural realm known as "longarm" jurisdiction. While the new language referring to where "substantial ... events ... occurred" will in some respects have an advantage over the "claim arose" standard, the implication that the latter is a litigation breeder while the former is not would raise an eyebrow or two among litigators. The "events ... occurred" idea is what longarm personal jurisdiction is based on, and longarm inquiries breed litigation in prodigious quantities.

Note the explicit reference to "omissions" in clause (2), also a word taken from the cited ALI recommendations. It establishes that in instances in which an act or acts were required by the engagement of the parties, and were required to take place in a given district, a failure to perform them in that district can qualify that district as proper venue.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

If tangible, or at least identifiable, property is the subject matter of the action--which would presumably exclude from this criterion the naked money action--proper venue lies in any district in which a "substantial part" of the property lies. This is the alternative offered by the second part of clause (2). It manifests that the physical presence of property can ground venue when the property is the very subject of the suit, even if the conduct that made the claim with respect to that property actionable took place elsewhere.

The "events" and "property" criteria of clause (2), incidentally, were previously used by Congress in 1976 in paragraph (1) of subdivision (f) of § 1391, governing venue in civil actions against foreign states. The criteria are destined to generate more activity from their new niche in subdivision (a) of § 1391. (They are in subdivision [b], too, as noted in the treatment of that subdivision, below, which will add to their influence.)

### Subdivision (a), Clause (3)

The final venue alternative in diversity cases, the one contained in clause (3) of subdivision (a), is any judicial district in which the defendants (note the plural) are subject to personal jurisdiction at action time. This clause, making venue satisfactory merely because personal jurisdiction is available, is similar to the one enacted in 1988 as part of subdivision (c), governing venue in actions against corporate defendants. See the Commentary on subdivision (c), below.

Clause (3) will be helpful in multiple defendant cases. Suppose, for example, that district X is the residence of defendant A, making it a proper venue against A under clause (1) of subdivision (a), but that defendant B, whom the plaintiff also wants to join, does not reside in the same state as A. The district will nevertheless be proper venue as to defendant B as long as B is subject to personal jurisdiction in that district, such as under a state longarm statute adopted for federal use by Rule 4(e) of the Federal Rules of Civil Procedure.

The clause can sometimes give a plaintiff a wide choice of forums. If the defendants are amenable to personal jurisdiction in many districts, any district in which all are amenable can be chosen as venue by the plaintiff (P). If, of those several districts, one is P's residence, P will be getting, through the back door, the option of laying venue in P's own district of residence, the option to which the front door was closed by the 1990 amendment of subdivision (a).

Note, however, the substantial proviso contained in clause (3). It is available only "if there is no district in which the action may otherwise be brought", which means that the plaintiff can turn to clause (3) only if there is no district that will satisfy as proper venue under clause (1) or clause (2). This conditioning of clause (3) was added in a 1992 amendment to make it correspond to the condition contained in clause (3) of subdivision (b), discussed below. In the original 1990 enactment, clause (3) of subdivision (a) was available as an immediate alternative; it was not dependent on venue under the first two clauses being unavailable. The 1992 amendment of subdivision (a)(3) does make it so dependent.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT B
50

Under clause (3), venue will apparently be proper as to B in a district in which the summons is merely served on B while B is physically present in the district, even if only transiently. (Jurisdiction based on mere physical presence was confirmed in its constitutionality by the U.S. Supreme Court in 1990 in Burnham v. Superior Court of California, 495 U.S. 604, 110 S.Ct. 2105.) And service in that particular district should not be necessary in such a case, either. The statute makes the district proper venue upon the mere showing that B is "subject" to jurisdiction in the district, and B would be subject to jurisdiction in that district even if served with process in a different district in the same state.

The use of the plural, "defendants", in clause (3) may raise some issues. In many cases it will happen that if any defendant is amenable to personal jurisdiction in the district, all will be. That won't always be so, however, and the case in which it isn't so is the one we should look at.

Suppose, for example, that the district is proper venue as to defendant A because he resides there, satisfying clause (1) of subdivision (a). It is also proper as to defendant B because B's conduct in respect of the claim took place in "substantial" measure in that district, satisfying clause (2) of subdivision (a). That leaves us with defendant C, who (assume) does not reside in the district and whose acts in respect of the claim took place in another state altogether. C just happens to be in the district, passing through or otherwise, and is served with process while there. Will clause (3) make the district proper venue as to defendant C? It apparently would. Being "subject to personal jurisdiction" is a phrase with a wide grasp. In the example, it would appear that all the "defendants" are subject to jurisdiction in that district: defendant A based on residence (and hence servability) there (this overlaps clause [3] with clause [1]); defendant B because of likely "longarm" jurisdiction, the claim against B arising from the substantial local acts or omissions of B in the district (this overlaps clause [3] with clause [2]); and defendant C, merely because C was served while passing through the state (this invokes clause [3] by itself).

When clause (3) says the defendants must be subject to personal jurisdiction, must that be shown to be so of all defendants even if one of them may not be amenable to personal jurisdiction at all? What about a rem jurisdictional possibility?

Suppose, for example, that the venue is proper as to both A and B under the second part of clause (2), which makes venue proper in a district in which property that is the subject of the action is located. If the property is there, it is quite possible that an adjudication with respect to A and B would be permissible on an "in rem" foundation. If rem jurisdiction would suffice as to A and B, but would not as to C--as where relief is sought against C that requires personal jurisdiction--would C's amenability to personal jurisdiction under clause (3) be washed away because A and B are not also subject to personal jurisdiction in the district and despite the fact that with respect to A and B rem jurisdiction offers all that is needed?

The use of a singular "defendant" in clause (3) would have avoided a number of questions, but it might also have made clause (3), or else clauses (1) or (2), or both (1) and (2), redundant. If there is but a single defendant in the case, S, and venue is proper as to S merely because S is "subject to personal jurisdiction" in the district under clause (3), what is the need of the other clauses? It would make no differ-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ence that under clause (1) S resides in the district, because under clause (3) it would suffice for proper venue that S is amenable to jurisdiction in the district whether resident there or not. Nor would it make any difference that some of the events at issue arose in the district under clause (2).

By using the plural, "defendants", clause (3) retains a function despite the questions it may also raise. If all of the defendants are subject to personal jurisdiction in the district, that district becomes a proper venue of the action against all the defendants even if none resides there and even if the underlying events occurred elsewhere. A reaction to that may be that if none of the events occurred there, how will all these nonresident defendants be subject to jurisdiction there? Suppose they were all in the district at a convention when P saw her opportunity and had them all served in the district. Here the *Burnham* case reappears, to assure, with its support of service alone as a jurisdictional basis, that all the defendants will be deemed "subject" to jurisdiction under clause (3), making the district a proper venue for the case even though the district is not the residence of any defendant nor the situs of any of the underlying acts.

In this last situation, however, there is of course the possibility of a transfer of the case under 28 U.S.C.A. § 1404(a)--but only if there's some other district, also one in which all would be amenable to jurisdiction, which would also qualify as proper venue under these involved new standards. See Hoffman v. Blaski, 363 U.S. 335, 80 S.Ct. 1084 (1960).

The sense of the amended subdivision (a) is really to make a district a proper venue if each of the defendants can be fitted within any one of the several criteria subdivision (a) offers, and the courts' construction of each of the individual clauses will probably be undertaken with that in mind. That would be concentrating on the forest so that no individual tree be allowed to obscure it.

### Subdivision (b), Clause (3)

Subdivision (b) governs in actions in which subject matter jurisdiction rests on something other than the diversity of citizenship of the parties. The chief category governed by subdivision (b) is of course the federal question case, the case that "arises under" federal law.

The first two clauses of subdivision (b) are the same as the corresponding clauses of subdivision (a) and can be left to what was said about those clauses above. Clause (3) is similar to the clause (3) of subdivision (a), but not the same. We restrict discussion here to the differences.

Under subdivision (a), the requirement of clause (3) is a showing that the defendants "are subject to personal jurisdiction" at action time. The plural, "defendants", is used, with the implication that all must be amenable to local jurisdiction. Under clause (3) in subdivision (b), the singular is used, the reference is to "any" defendant, and proper venue is any judicial district in which any one defendant may be "found". The gift in this is that it makes that district a proper district of venue for the whole action and with respect to all of the parties, which the corresponding clause of subdivision (a) does not do. In common with subdivision (a)'s clause 3, however, clause (3) in subdivision (b) may be invoked only if no district qualifies as proper venue under clause (1) or clause (2).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Clause (3) in subdivision (b) will have its uses. If, for example, there are several defendants who reside in different states (making venue under the first clause unavailable), and the district is not one in which substantial background events took place or in which substantial property that is the subject of the action is located (making venue under the second clause unavailable), the third clause arrives to save the day as long as any one of the defendants may be "found" within the district. (It is of course assumed, as it must be in all venue discussions, that there is also some way of obtaining personal jurisdiction of all the defendants. Inability to do that usually makes a venue discourse academic, at least where the plaintiff is bent on a single suit against them all. We assume throughout that personal jurisdiction is available, either because of a nationwide service statute applicable in the particular case, or because defendants are served within the state even if only passing through, etc.)

Why is "found" used in clause (3) in subdivision (b), while "subject to personal jurisdiction" is the operative phrase in clause (3) of subdivision (a)? Is there a difference? Must the defendant be "found" in the district physically in order to invoke clause (3) in subdivision (b)? Is it not sufficient if the defendant resides and is to be "found" eight states away, but is amenable to personal jurisdiction in this district on the basis (for example) of longarm activities that invoke a state statute and permit extraterritorial jurisdiction under the adoptive provisions of Rule 4(e) of the Federal Rules of Civil Procedure?

Was it the intent of Congress, whatever other intents there may have been along the way, to make amenability to personal jurisdiction the criterion under clause (3) of both subdivisions--subdivision (a) and subdivision (b)--despite the explicit reference to "jurisdiction" in subdivision (a) and the use of the word "found", instead, in subdivision (b)? An affirmative answer to that question can be spelled out by referring to the House Report of the Committee on the Judiciary (Report 101-734), where there is some discussion of the bill section amending § 1391. The amending section is § 311 in the final bill that the President signed on December 1, 1990 (Pub.L. 101-650), but it bears the designation § 110 in the cited House Report (Report 101-734) issued earlier (on September 10, 1990).

In the last paragraph at the bottom of page 23 of the House Report there is a reference to clause (3). (Actually the reference is to a "Subsection 3", but the context and subject matter of the discussion make it clear that it is clause 3 that is being discussed.) It says that the clause is meant to cover the cases in which no substantial part of the events happened in the United States and in which all the defendants do not reside in the same state.

That statement acknowledges the absence of venue under clauses (1) and (2). Then follows the statement that clause (3)--still improperly identified as "Subsection 3"--is designed to

  act as a safety net by allowing venue in a "judicial district in which the defendants are subject to personal jurisdiction at the time the action is commenced".

The language it uses, about "personal jurisdiction", is the language of clause (3) as it appears in subdivision (a). But once again the context indicates that the reference is either to both subdivisions (a) and (b), or, if it is deemed to refer to only one of the two, the reference appears to be to subdivision (b),

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

which deals with nondiversity cases and which is the subject of the discussion in the immediately pre-ceding paragraph. Subdivision (b), as noted, speaks of where the defendant "may be found", and yet the committee report treats it as referring to where the defendants are "subject to personal jurisdiction". This could have been a discussion intended only for subdivision (a), with no special discussion intended for subdivision (b) at all, but that is not what the context indicates.

More should be noted about this aspect of the Report. The actual subsection 3 in the enacting provision--§ 311 in Pub.L. 101-650 but which appears as § 110 in the House Report version--refers not to the sub-divisions (a) and (b) that we have been discussing, but to the provision that amends subdivision (e) of § 1391 (which we get to below). It may be important to recognize this. Congress substantially altered the provisions submitted to it by the study committee, and statements of intent may become important in trying to find out what some of the Congressional changes were intended to accomplish. It may there-fore help to keep in mind that the "Subsection 3" reference at the bottom of page 23 of the House Re-port is not a reference to subsection 3 of the enacting statute, which amends § 1391(e) and which it may at first appear to refer to, but to clause (3) of the amended subdivision (b) of § 1391, or to clause (3) of both amended subdivisions, (a) and (b), together.

If it was not the intent of Congress to make amenability to personal jurisdiction the criterion under clause (3) in both subdivisions (b) and (a), despite the explicit reference to the word "found" in subdivi-sion (b), then there is of course room to give the word "found" in subdivision (b) a different construc-tion than the "subject to personal jurisdiction" language of subdivision (a). But what construction?

It would seem that the defendant's amenability to longarm jurisdiction in the district suffices to make that district proper venue as to that defendant under the "substantial events" language of clause (2) of subdivision (b). The "substantial events" out of which the claim arises should subject the defendant against whom the claim exists to the personal jurisdiction of that district under longarm concepts, and clause (2) of subdivision (b) would appear to make that district proper venue on the same basis. If that is so, then a district that satisfies clause (2) with respect to a given defendant for the reason that longarm jurisdiction exists against that defendant in the district should satisfy the venue requirement even if the defendant is not now "found" in that district under the language of clause (3).

If all of the defendants are subject to personal jurisdiction in the district, but only one of them is served there--establishing that at least that defendant has been "found" there--clause (3) of subdivision (b) should make that district proper venue against all the defendants, no matter what the basis for personal jurisdiction against them may be and no matter where they may have been served with process, but this is so only when there is no other district that would qualify as proper venue for the whole action. A pro-viso of clause (3) of subdivision (b), remember, is that the district in which a defendant may be "found" is proper venue only "if there is no district in which the action may otherwise be brought". This means that if proper venue is available under clause (1) or (2) of subdivision (b), resort may not be had to clause (3).

A stated intent behind clause (3) is that it is designed to cover "cases in which no substantial part of the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

events happened in the United States". (House Report, p. 23.) That is pertinent to both subdivisions, (a) and (b). The theory here, of course, is that if a substantial segment of the background events occurred in the United States, there would at least be the actual district in which they arose to offer proper venue. (That can be contested, too, if one is disposed to a contest, because a case can arise in which a little bit occurred in a great many districts but not a sufficient quantum in any one of them to qualify as "substantial".)

Nothing in these venue statutes is intended to expand the personal jurisdiction of the federal courts. If a district appears to satisfy some venue standard with respect to one or a few defendants, there is no magic in § 1391 that will obtain jurisdiction that does not otherwise exist. Two or more actions may then have to be brought in separate districts, or, as the House Report describes it in its last statement on the cited page 23, "in separate courts".

### Subdivision (c)

### Background of 1988 Amendment

The old subdivision (c) allowed venue in an action against a corporate defendant to be laid in the corporation's district of incorporation or in any district in which it was licensed to do business or actually doing business. The view on which Congress acted in amending the subdivision was apparently based on the "licensed to do business" segment of the old statute: since a corporation that duly licenses itself under state law is authorized to do business anywhere in the state, the "licensing" standard would, in a state with several districts, X, Y, and Z, make any district in that state a proper venue in an action against a corporate defendant even if all of the corporation's activities were in X district alone. It was this alternative that Congress, citing a Judicial Conference recommendation, sought to eliminate with the 1988 amendment. (See Representative Kastenmeier's Report in behalf of the House Judiciary Committee [Rept. 100-889, August 26, 1988, page 70].)

In making the change, however, Congress recast the provision in its entirety, perhaps producing some open questions in the course of doing so.

### No Application to Plaintiff Corporation

First, Congress abandons the old language and its two distinct and conflicting clauses. The first clause opened with "(a) corporation may be sued in ... " and related only to a corporate defendant. The second clause, connected to the first with a simple conjunctive, said "and such judicial district shall be regarded as the residence" of the corporation for venue purposes. Since the first clause applied in terms only to a defendant corporation, it was logical to conclude that the second clause was meant to apply to a plaintiff corporation. But that construction was deemed to give too broad a choice of venues to a corporate plaintiff and was rejected. See Manchester Modes, Inc. v. Schuman, 426 F.2d 629 (CA2 1970), following on this point Robert E. Lee & Co. v. Veatch, 301 F.2d 434 (CA4 1961), certiorari denied 371 U.S. 813, 83 S.Ct. 23 (1962). A corporate plaintiff might, in a diversity case (in which, under old subdivision (a) of § 1391, a plaintiff could lay venue in its own district of residence), select as its residence

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

its state of incorporation, but if it was doing business in a myriad of other districts as well it would not have the option to venue the case in any of the others--unless, of course, the one chosen happened to qualify as proper venue under some other provision. It might be the defendant's residence, for example, or the district in which the claim arose, both of those being options available under either subdivision (a) or (b) of § 1391 (as they were constituted at the time).

If the second clause of old subdivision (c) didn't apply to a plaintiff corporation, though, then what did it apply to? It wasn't needed to apply to a corporate defendant, because that was the obvious mission of the first clause. Through a little historical reachback, and perhaps a little temporary gymnastics, gainful employment was found for the second clause (for which see the Manchester and Veatch cases cited above), but it did not include authorizing a corporate plaintiff to sue in any of its own "doing business" districts.

Turning now to the new subdivision (c) and its fresh approach, the new subdivision eliminates any ambiguity that might relate it to a plaintiff corporation. It assumes to define residence only in respect of "a defendant that is a corporation". Subdivision (c) says this in each of its two sentences. A plaintiff corporation today may not lay venue in its own district even if the district is the district of the plaintiff's incorporation, as might have been permissible in a diversity case under the old (pre-1990) version of subdivision (a), which allowed as proper venue the district of the plaintiff's residence. See the Veatch case, cited above. A plaintiff's option to lay venue in a district solely because the plaintiff resides there was eliminated by the 1990 amendment of subdivision (a).

When it was sought to find some function for the second clause of the old subdivision (c), one function the courts found for it was to define venue for other federal statutes, enacted for cases with special subject matter, which statutes set venue in a corporation's residence but failed to define "residence" for itself. One such statute in need of a "residence" definition was § 1400(b) of Title 28, permitting venue in a patent infringement suit to be brought where the defendant "resides". Did the undefined "resides" in that statute draw its definition from old § 1391(c)? The U.S. Supreme Court held in Fourco Glass Co. v. Transmirra Prods. Corp., 353 U.S. 222, 77 S.Ct. 787 (1957), that it did not; that § 1400(b) was not to be deemed supplemented by § 1391(c). (It did offer such a supplement to other statutes, however, so it still had something to do.)

This background is pointed out by the U.S. Court of Appeals for the Federal Circuit in a treatment of the new § 1391(c)'s interaction with § 1400(b). In VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574 (1990), cert. denied 111 S.Ct. 1315 (1991), the court reviews the history of the issue and concludes that the 1988 amendment of § 1391(c) changes the Fourco result and now invites as an additional venue for patent infringement cases--additional to what § 1400(b) sets forth--that offered by the amended subdivision (c) of § 1391. Hence any district in which a corporate defendant is subject to jurisdiction will also qualify, under the terms of § 1391(c), as proper venue in a patent infringement suit.

The court points out that § 1400 of Title 28 occupies the same chapter as § 1391 does--both are in Chapter 87, the venue chapter--and that the language of § 1391(c) is that it applies "[f]or purposes of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

venue under this chapter". That, concludes the court, is the "exact and classic language of incorpora-
tion".

## Application to Defendant Corporation

Turning attention now to the residence of the corporate defendant, to which subdivision (c) is exclus-
ively addressed, we assume through all of the ensuing discussion that the action is brought against a
corporation.

It should be noted as a preliminary that the subdivision (c) test of a corporate defendant's residence ap-
plies only when the plaintiff has opted to lay venue in the defendant's district of residence, which the
plaintiff can do either in a diversity case under subdivision (a) of § 1391 or in any other kind of case
under subdivision (b).

Subdivision (c) now provides that the corporation is to be deemed a resident of any judicial district in
which "it is subject to personal jurisdiction at the time the action is commenced". This means that any-
thing that would make the corporation amenable to jurisdiction in that district, or permit extraterritorial
service of the court's summons under any of several well-known tests, would ipso facto make that dis-
trict a proper venue as well.

The corporate "doing business" test is one such test. A showing that the corporation is regularly doing
business in the district subjects it to the personal jurisdiction of the courts there and hence makes that
district a proper venue in an action against the corporation. (See Commentary C4-28 on Rule 4 of the
Federal Rules of Civil Procedure in the 28 U.S.C.A. set.) That was of course a proper venue under the
prior statute as well. So was the district in which the defendant was incorporated. And so was any dis-
trict in which the defendant was licensed to do business even though it was neither incorporated nor ac-
tually doing business there. All of those things happen also to be bases for holding the defendant amen-
able to personal jurisdiction, so it would appear at this juncture that just about all of the prior statute's
venue bases subsist under the present one (subject to the restriction set forth in the second sentence of
subdivision [c], discussed below under the caption "Venue If State Has Several Districts").

But the present statute goes further, also authorizing venue in any district in which a state longarm stat-
ute would be applicable to justify extrastate service. Longarm statutes proliferate under state law today,
and all of these are adopted by Rule 4(e) of the Federal Rules of Civil Procedure for use in all federal
actions--and without regard to the basis on which subject matter jurisdiction rests in the action. That is,
they apply not only in diversity cases, but also in federal question cases, admiralty cases, cases in which
the United States is a party, etc. (See Commentary C4-27 on Rule 4.) Whenever a state longarm statute
applies, enabling the plaintiff to secure personal jurisdiction of the corporate defendant regardless of
where the defendant has been served with process, a district in that state now qualifies ipso facto as
proper venue as against that defendant.

That was not universally true under the venue standards of the old subdivision (c). Some courts did as-

similate the two things, holding venue present whenever longarm jurisdiction was, but a number of others, including some at circuit level, would not go along. To them the "doing business" test for venue was more demanding than the softer test that had evolved under longarm statutes addressed to jurisdiction, and in that light venue might well be lacking even if jurisdiction offered by a state longarm statute was present. See Maybelline Co. v. Noxell Corp., 813 F.2d 901 (8th Cir.1987), one of the cases refusing to assimilate the two tests; it collates the cases both ways.

Under the first sentence of the amended subdivision (c), the Maybelline line of cases is overruled, and proper jurisdiction under a state longarm statute does indeed mean proper venue under the federal corporate-venue statute. There is an overlap in this regard here between subdivision (c), governing corporations, and clause (2) in subdivisions (a) and (b), governing parties generally. The latter two subdivisions were amended two years after the amendment of subdivision (c) under discussion here, and there was no coordination of them with the earlier amendment of subdivision (c). While subdivision (c) would seem to be preemptive of venue in actions against a corporation, the purpose of the subdivision (c) amendment was to expand venue opportunities in actions against corporations.

In that light, if a case should arise in which venue is technically missed under subdivision (c)--the case just fell through the cracks--but would be available against the corporation under subdivision (a) or (b), it would not be inconsistent with Congressional intent to uphold the venue against the corporation. One case that comes to mind to illustrate this possibility is where the action involves specific property and is brought in rem, with venue laid in the district of the property under clause (2) of either subdivision (a) or subdivision (b). The district, proper now under clause (2) of one of those subdivisions because it is the situs of the property, should be a sustainable venue against a corporation, too, in this in rem case, even if there is no basis for personam jurisdiction against the corporation under subdivision (c).

### Effect on Venue of Federal Statute Allowing National Service

A word here should be said about actions in which a federal statute allows national service. There are a number of these (see Wright and Miller, Federal Practice and Procedure §§ 1118, 1125), and when one of them is applicable it enables personal jurisdiction to be obtained against the defendant no matter where service is made. If the statute authorizing nationwide service is part of a package that also has a special venue prescription, as it often is, the venue prescribed may be exclusive and a measure under subdivision (c) of § 1391 may be unnecessary.

But suppose, in a realm in which a statute authorizes nationwide service, that there is no companion statute setting venue, thus necessitating resort to § 1391(c). What impact will there be on venue under the new subdivision (c) if the corporate defendant is amenable to service anywhere in the country (or, for that matter, beyond) without reference to any contacts the defendant may have, or may note have, with the district? Applying the simple language of the statute, it would appear that the plaintiff can lay venue in that case in any district at all, anywhere in the nation. If for some tactical reason the plaintiff should choose a district having nothing to do with the case at all, but now qualifying as proper venue under subdivision (c)--and thus escaping a dismissal under § 1406(a), the wrong-venue statute--there's always old faithful § 1404(a) of Title 28 to turn to for a transfer to a more appropriate district.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Problems of this kind would not arise under prior law even if a nationwide service statute (without its own venue directions) applied in a given case, because, ironically, the general venue provisions of the old § 1391, and their distinct contacts requirements, including the now superseded subdivision (c), would have seen to it that the action was not brought in a district wholly unrelated to the case and the parties. Now, though, under the amended subdivision (c), the venue statutes don't offer that guidance when the defendant is a corporation. So, when a plaintiff with a nationwide service provision in tow (unaccompanied by a special venue prescription) extends its hand to subdivision (c) for venue instructions about proper district, it will find subdivision (c)'s own hand out waiting for instructions from the nationwide service provision that the plaintiff is towing. With the 1988 amendment of subdivision (c), in other words, the statute that once had standards with which to guard against a promiscuous choice of venue now adopts instead a standard that it once stood guard against.

Another variation on this theme would be where a given category of action has both a nationwide service authorization and a special venue instruction as well, but with the special venue provision turning on a word that seems to require resort to subdivision (c) for definition, as where it sets venue where the corporation "resides" or is "an inhabitant". See the discussion of the Clayton Act's venue provision in 15 Wright, Miller and Cooper § 3818. When a case in that category looks to subdivision (c) to tell it where the corporation resides, subdivision (c) will just respond that it resides wherever service can be made.

If a circular dilemma of that kind occurs, the court might just step down to the pragmatic solution offered by the second sentence of subdivision (c) in other situations in which a proper district can't be singled out, and just set venue in that district in the state with which the defendant has "the most significant contacts". (See the Commentary "Venue If State Has Several Districts", below.)

### Venue If State Has Several Districts

The second sentence of subdivision (c) applies when the defendant corporation is amenable to jurisdiction in a state having several districts. It prescribes which of them shall be the proper venue.

If the contacts that are relied on for jurisdiction, such as when a longarm statute is applicable, were all with but one district, that district is the defendant's residence for venue purposes. If there are several districts in the state--assume there are three, named X, Y, and Z--and the defendant had contacts with both X and Y (but not Z) such that, independently measured, jurisdiction would have been available in either X or Y on a longarm measure, then either X or Y qualify as the corporate residence, but not Z.

The same applies with a "doing business" measure. If the corporation is doing regular day-to-day business in Y and Z, but not X, then the defendant is amenable to jurisdiction, and is therefore deemed to have its residence, in Y and Z, but not X.

Finally, suppose that no district qualifies. Suppose, for example, that the corporation is doing business in the state sufficient in the aggregate to support personal jurisdiction against it, but that the activities

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

are equally divided among the state's three districts and in none, individually, is the defendant doing enough to support a "doing business" label. The second sentence of subdivision (c) says that the corporation shall in that instance be deemed to reside in the district with which it had "the most significant contacts".

That's an answer, but an unfortunately disorderly one. It has the potential to generate some extensive fact contests. The phrase comes from the Conflict of Laws, where it serves as an ostensible guidepost whereby, in a case involving several states with conflicting substantive laws relating to a single issue, the forum is to choose which of them is to apply. See, e.g., the "most significant relationship" phrase and its operation in Restatement 2d, Conflict of Laws §§ 145(1) (torts), 188(1) (contracts), and the factors, listed in § 6, that can come in for consideration under it. The stakes here under subdivision (c), however, will rarely be as high as in a choice of law setting, and the court will have more discretion.

### Commencement of Action Is Key Time in Measuring Jurisdiction

In determining whether a defendant is subject to jurisdiction, or "resides" in a given district, under any of the measures of subdivisions (a), (b), or (c) that make one of those things relevant, the moment that counts is ordinarily the time of commencement of the action. This means the filing of the complaint under Rule 3 of the Federal Rules of Civil Procedure. Presumably it would not require, even in a diversity case, resort to state law should state law prescribe a different time for "commencement", but one never knows. In measuring whether a diversity action is properly commenced for statute of limitations purposes, state law, and not Federal Rule 3, is indeed the measure used. So held the U.S. Supreme Court in Walker v. Armco Steel Corp., 446 U.S. 740, 100 S.Ct. 1978 (1980). (See Commentary C4-37 on Federal Rule 4 in the 28 U.S.C.A. set.) The Walker case was indulgent of the policies underlying the application of a state statute of limitations under Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817 (1938). State policies are less at stake, if indeed they are implicated at all, in measuring what the venue should be in a federal district court action. It would therefore seem inappropriate to turn to state law, even in a diversity case, to determine the moment of "commencement" for a jurisdictional measure being used only for its venue impact. Compare Leroy v. Great Western United Corp., 443 U.S. 173, 99 S.Ct. 2710 (1979).

(In cases removed to federal court from state court, federal venue is not applicable and hence negotiation with § 1391 is not necessary. The proper venue of a removed action is the district physically embracing the state court from which the case is removed. See § 1441[a] of Title 28.)

Some of the jurisdictional bases a plaintiff may rely on to show proper venue against a defendant will exist without regard to when the action is commenced. They will depend on other factors that make the time of commencement irrelevant. With longarm jurisdiction, for example, the jurisdiction will be based on the contacts that the defendant had with the state earlier, when the defendant performed the acts out of which the claim arises. If the defendant had such contacts, they freeze in time and stand ready at all times to supply longarm jurisdiction. Hence, for both jurisdiction and for venue in a longarm case, the moment of commencement of the action won't matter (however much it may matter, of course, in measuring the statute of limitations).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

But with some other bases the time of commencement will count. It will count, for example, if the basis of jurisdiction being relied on is not the relationship that the particular claim has to the state, but the physical presence of the defendant in the state, including, in the case of a corporate defendant, the carrying on of regular business in the state. This is the "doing business" test once again. The test's role, express under the old subdivision (c), is subsumed under the present one: it's one of the tests that make a defendant amenable to jurisdiction. And unlike the longarm test, which requires a showing that the claim itself had some connection with the defendant's local activity, the doing business test works to subject a corporate defendant to jurisdiction on any claim at all, related or not to the state. It is the corporation's physical presence that accounts for jurisdiction in this instance; "doing business" merely means doing such a regular quantity of business that the corporation is as physically present at a place as would a natural person be who is standing there. The whole corporate "doing business" concept, in fact, is just a test devised to enable a court to draw an analogy between a natural person standing in the state--and amenable to service for that reason alone--and a corporation carrying on regular activities within the state, which the law says should make the corporation amenable to local service to the same degree.

A plaintiff relying on a showing of the corporation's doing business in the state would have to show that the corporation was doing business when the action was commenced. Jurisdiction would not necessarily obtain under subdivision (c) if, while the corporation was doing business earlier, it had stopped doing it before the action was commenced.

### Subdivision (e)

Subdivision (e) of § 1391, the provision governing venue when a defendant is the United States or one of its agencies or employees, was also amended in 1990. Before 1990, the subdivision had four numbered clauses, the middle two of which authorized venue in the district in which the claim arose (clause [2]) or in which any real property involved in the action was situated (clause [3]). Those two clauses are stricken out by the 1990 amendment and in their place is substituted, as clause (2), the same clause (2) that appears in the amended subdivisions (a) and (b), basing venue on "events" or "property". Old clause (4) moves up to become clause (3) of subdivision (e) under the amendment.

COMMENTARY ON 1995 REVISION OF SUBDIVISION (A), CLAUSE (3)

*by David D. Siegel*

As originally enacted in the Judicial Improvements Act of 1990 (Pub.L. 101-650), the clause (3) contained in subdivision (a) of § 1391, applicable in diversity cases, differed from the clause (3) contained in subdivision (b), applicable in other (including federal question) cases, in two particulars.

The first was that when a proper venue couldn't be found under the first two clauses, subdivision (a)'s clause (3) authorized venue where defendants were "subject to personal jurisdiction", while subdivision (b)'s clause (3) authorized it where any defendant "may be found". In that particular, the 1995 amendment makes no change, retaining the differing "subject to ... jurisdiction" and "may be found" standards

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

of the two subdivisions. We discuss the possible meanings of these two distinct phrases in the original Commentaries. Because they are not changed, the discussion in that respect remains relevant.

The other particular in which the two clauses originally differed is that subdivision (a)'s clause (3) used the plural, referring to a district in which "the defendants are" subject to jurisdiction, while subdivision (b)'s clause (3) used the singular, referring to a district in which "any defendant" may be found. It is this item that the 1995 amendment changes, altering subdivision (a)'s plural reference to conform to subdivision (b)'s use of the singular. Under § 1391(a)(3), proper venue will now lie--assuming there's no district that would satisfy the earlier clauses, (1) and (2), which remain conditions precedent--in a district in which "any defendant" is subject to personal jurisdiction.

References in prior Commentaries to the now-repealed difference should be adjusted accordingly.

The change is effected by Public Law 104-34, which was approved on October 3, 1995. The purpose of the change is to avoid the implication that subdivision (a)(3) requires that all defendants be subject to personal jurisdiction in the district before offering proper venue. The district will be proper venue if any of the defendants is subject to personal jurisdiction there. The amenability to jurisdiction of the one makes the district a proper venue as to all.

A possible problem in multi-defendant cases, to which discussion is now directed, is that there must still be some basis for jurisdiction against the other defendants. While a showing that a defendant is subject to jurisdiction in a particular district will automatically make it a proper venue as to all defendants in some circumstances--the very mission of clause (3) in both subdivisions (a) and (b) of § 1391 being to recite one such circumstance--the converse is not true: mere proper venue in a given district, vis-a-vis a given defendant, will not automatically subject the other defendants to personal jurisdiction there.

But if, on the other hand, there is also a basis for personal jurisdiction in that district against all of the other defendants, then there is no need for the change made by the 1995 amendment.

Perhaps we should conjure up an example that would produce some gainful employment for the 1995 change--some case in which the first two clauses would not answer and in which personal jurisdiction of one of the defendants is available in the district under clause (3) but wouldn't be under the first two clauses. We'll use an example that incidentally illustrates the use of all of the clauses of subdivision (a).

Suppose the defendants are W, X, Y, and Z, and the plaintiff is trying to select the Northern District of New York as proper venue. W resides in the Northern District of New York, but X, Y, and Z don't even reside in state, much less the district, thus dismissing clause (1) as an authorization for venue because clause (1) requires a showing that the other defendants at least reside in the same state.

Can clause (2) help? Suppose that while X does not reside in the Northern District of New York, his

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

acts, out of which the claim arises, took place there. That would make it a proper district of venue under clause (2), which allows venue where "a substantial part of the events" occurred, but it would still be necessary to show that X is amenable to personal jurisdiction there. If his acts were performed there, however, such as to support proper venue under clause (2), they would likely invoke the state's longarm statute as well, thus also supplying personal jurisdiction of X in that district. See Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure, which adopts state longarm jurisdictional bases for exploitation in the federal courts of the state. Both jurisdiction and venue would now be available as to W and X without reaching clause (3), so a function for the latter has not yet been found.

Perhaps the most likely use of clause (3) would be a case involving rem jurisdiction, which implicates the second part of clause (2). Suppose that Y, the third codefendant in our postulate, does not reside in New York, making clause (1) unavailable for venue, and didn't perform actionable conduct in New York, making the first part of clause (2) unavailable for venue. But suppose further that the case involves specific property as its subject matter, and that this property, in which Y has an interest, is located in the district. That would make the district a proper venue under the second part of clause (2), which makes the district proper if it's the situs of "a substantial part of property that is the subject of the action". While it would not furnish a basis for personal jurisdiction against Y, it would at least furnish a foundation for rem jurisdiction against Y. That would enable the case to proceed against Y in the district, in point of both jurisdiction (of at least some kind) and venue.

We still have not found anything for clause (3) to do, though. But now make another assumption, vis-a-vis the remaining defendant, Z. Z does not reside in New York, so clause (1) doesn't offer venue as to Z. Assume his acts occurred outside the district, so that the first part of clause (2) doesn't offer venue, either. Nor is any of Z's property in the district, dismissing the last part of clause (2) as a possible venue basis. That leaves only clause (3) to help, if it can. Can it?

Maybe. Suppose that Z is just passing through the district when he's served with the summons, thus exploiting the local-service basis for jurisdiction (discussed at page 11 of the main-volume Commentaries). Service on Z in that district ought to satisfy the "subject to personal jurisdiction" language of clause (3), unless the courts come up with a narrower construction, perhaps in the course of trying to figure out a difference between the "subject to personal jurisdiction" phrase of subdivision (a)'s clause (3) and the "may be found" phrase in subdivision (b)'s clause (3).

Recapping the example, the district would be proper venue as to:

    W, because he resides there (clause [1]);

    X, because he committed acts there, out of which the claim against him arises (first part of clause [2]);

    Y, because the claim affects property in the district, in which Y shares an interest (second part of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.         EXHIBIT B

clause [2]); and

Z, because he was caught with process while physically passing through the district and was thereby made subject to personal jurisdiction there (clause [3]).

It's a wondrous case, including the fact that while jurisdiction might exist against W, X, and Z in personam, it would apparently exist as to Y only in rem, and only to the extent of Y's interest in the property located in the district.

We observed in the original Commentary, that

[t]he use of a singular 'defendant' in clause (3) would have avoided a number of questions, but it might also have made clause (3), or else clauses (1) or (2), or both (1) and (2), redundant.

Now that the change has been made, what can we say? Perhaps a fair statement would be that while the 1995 change in clause (3) of § 1391(a) doesn't make it wholly redundant, whatever architecture it contemplates in a multi-defendant action comes out a bit baroque.

Was a simpler structure contemplated?

In the case of but a single defendant, clause (3) of subdivision (a) should of course function readily enough. If the defendant doesn't reside in the district, and did nothing in the district, and has no interest in any property in the district, letting out clauses (1) and (2) and putting all the chips on clause (3), a showing that the defendant is subject to personal jurisdiction in the district would make it a proper venue. But what could make the district a source of personal jurisdiction in an action against a defendant who doesn't reside in, did nothing in, and has no property in the district? Once again the possibility would seem to narrow down to service made on the defendant while physically present in the state, even if only transiently.

The same would be true of a multi-defendant case in which all of the defendants lack district contacts such as might invoke either of the first two clauses, but all could be served in the district. What kind of scenario would produce that combination of factors? One might be a convention in the district at which all of the defendants are present, and hence servable locally, but is that what the revisers had in mind?

On both fronts, the single-defendant as well as the multi-defendant case, clause (3) of subdivision (a)--and, for that matter, clause (3) of subdivision (b), too--may have to depend for its contribution on cases in which jurisdiction rests on transient service. And if, in any such case, another district also qualifies as proper venue and is a district in which the defendant is amenable to jurisdiction, as is not unlikely, another possibility looms over the case: a transfer from the chosen district to some other more appropriate district under 28 U.S.C.A. § 1404(a).

Case 8:14-cv-01020-DOC-AN   Document 10-1   Filed 08/07/14   Page 70 of 70   Page ID #:100

Imagine that? After all our effort to find some use for clause (3), along could come § 1404(a) to tell us that we may have been wasting time all the while.

An even darker scenario for the plaintiff would be where the defendant is an alien, where it may be found that the most appropriate place for the case is a court in a foreign country. That could bring about an outright dismissal of the case, a possibility that still exists apart from 28 U.S.C.A. § 1404(a), the transfer statute. See, e.g., Piper Aircraft Co. v. Reyno, 454 U.S. 235, 102 S.Ct. 252 (1981).

It must always be recalled, of course, that the use of the amenability-to-jurisdiction venue basis of clause (3) is available only "if there is no district in which the action may otherwise be brought". In multi-defendant cases, this may entail an analysis of a lot of districts to see how they fare under this standard, because if any other district could qualify as proper venue as to all defendants, without clause (3) being needed, then clause (3) doesn't apply.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT B
65